**In re THOMAS W. GARLAND, INC., Debtor.**

**THOMAS W. GARLAND, INC., Plaintiff,**

v.

**INTERNAL REVENUE SERVICE, Defendant.**

Bankruptcy No. 80–01175(1).

Adv. No. 82–0372(1).

United States Bankruptcy Court, E.D. Missouri, E.D.

April 17, 1984.

Curtis L. Mann, Clayton, Mo., for debtor/plaintiff.

Ludwig H. Adams, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., Thomas E. Dittmeier, U.S. Atty., St. Louis, Mo., for defendant.

## MEMORANDUM OPINION

ROBERT E. BRAUER, Bankruptcy Judge.

Pending for decision is a Complaint filed by Thomas W. Garland, Inc., (Garland's), Debtor-in-Possession, to recover two allegedly preferential transfers made by Garland's to the United States of America, Internal Revenue Service (IRS), a few weeks prior to filing its Petition under Chapter 11 of the Bankruptcy Code. The cause was submitted on a Stipulation of Facts which may be summarized as follows:

Garland's (Debtor), operated a chain of women's retail clothing stores in the St. Louis Metropolitan Area. In 1974, the Debtor entered into an "Agreement For Operation Of Leased Shoe Departments" with Cheldon Shoes, Inc. (Cheldon). Cheldon leased floor space in the Garland's stores where Cheldon employees sold its shoes and related accessories. Cheldon's daily receipts were turned over to Garland's for processing and accounting. Once a month the sales proceeds were remitted by Garland's to Cheldon, less rent and other designated expenses. The lease arrangement continued until February 28, 1980, at which time it was terminated by prior option of Cheldon. Garland's may have owed Cheldon as much as $34,678.90 on this date.[1]

On February 15, March 24, and March 31, 1980, a delegate of the Secretary of the Treasury made assessments against *Cheldon* for *Cheldon's* withholding and Federal Insurance Contribution Act (FICA) tax liabilities for 1979, and gave notice and demand for payment of those taxes.

On May 1, 1980, a Revenue Officer of the IRS served Garland's with a Notice of Levy upon all property and rights to property belonging to Cheldon which were in Garland's possession, and "all sums of money or other obligations" owing from Garland's to Cheldon to a maximum of $24,251.78. Pursuant to the Notice of Levy, by check dated May 6, 1980, Garland's paid $2500 to the IRS. Garland's made a second payment of $2500 to the IRS by check dated May 9, 1980. No further payments were forthcoming, and, on May 27, 1980, Garland's filed its voluntary Petition under Chapter 11 of the Bankruptcy Code. On November 23, 1981, this Court confirmed Garland's proposed plan of reorganization which provides for a complete liquidation of the Debtor's business.

I find, as a matter of fact and for purposes of the following discussion, that the two $2500 transfers were made from property belonging· to Garland's. The parties do not stipulate that Garland's segregated those funds collected from the sale of Cheldon's shoes and accessories, and the IRS did not attempt to trace the payments it received to a separate bank or trust or other kind of segregated account. The Debtor is deemed therefore to have paid the IRS out of its own general operating funds.[2]

---

1. Cheldon filed a Proof of Claim in the amount of $34,678.90, but the Debtor has filed objections to the claim. According to the Debtor's records, on May 1, 1980, it owed to Cheldon the sum of $23,369.35.

2. The parties spend some time in their briefs debating whether or not the Debtor held the funds in trust for Cheldon. However, as a matter of fact, a separate fund was not shown to exist, and, as a matter of law, it is questionable whether or not a trust relationship was created

Garland's charges that the two $2500 payments to the IRS made just three weeks prior to the Bankruptcy are preferential transfers recoverable pursuant to 11 U.S.C. § 1107 and 11 U.S.C. § 547. To find that a preferential transfer was made, Garland's must prove that the transfers of the Debtor's property were:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; ... and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

A threshold issue which must be resolved is whether or not the IRS was at the time of the payments a "creditor" as that term is used in the Bankruptcy Code, and, conversely, whether or not the payments were made in payment of a "debt" to the IRS. "Creditor" is defined for purposes of Title 11 as "an entity[3] that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor, ..." that is, an entity with a pre-petition claim. 11 U.S.C. § 101(9). A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, secured, or unsecured...." 11 U.S.C. § 101(4). "Debt" means liability on a claim. 11 U.S.C. § 101(11).

Service of the Notice of Levy created a right to payment in favor of the IRS of any and all sums owing by the Debtor to Cheldon up to the amount of levy. 26 U.S.C. § 6332. The Debtor admittedly owed at least $23,369.35 to Cheldon on the date the Notice of Levy was served and demand for payment was made. Therefore, the Debtor was obligated to pay such sum to the IRS in response to the Notice of Levy. The Debtor could be held personally liable for failing or refusing to so respond. 26 U.S.C. § 6332(c). A proceeding by the United States to recover for refusal to surrender property belonging to a delinquent taxpayer is not an action in rem or a suit for collection of a tax. It is a suit to enforce *personal liability* for failure to surrender property belonging to a delinquent taxpayer. *Commonwealth Bank v. United States*, 115 F.2d 327 (6th Cir.1940); *United States v. Stockyards Bank of Louisville*, 231 F.2d 628 (6th Cir.1956). Accordingly, I find that the IRS, upon its service of the Notice of Levy, became a creditor of Garland's, and that Garland's became indebted thereby to the IRS.

The debt to the IRS arose on May 1, 1980, when the Notice of Levy was served. The transfers were made subsequent to May 1, when the checks, dated May 6 and May 9, were delivered to the IRS. Thus the first two elements of a preferential transfer have been satisfied. The transfers were made to the IRS, a creditor of Garland's [§ 547(b)(1)], and they were made for or on account of an antecedent debt owed by Garlands, which arose on May 1, 1980, before the transfers were

---

by the Lease Agreement, which contained language strikingly similar to the Lease Agreements at issue in *Carlson, Inc. v. Commercial Discount Corp.*, 382 F.2d 903 (10th Cir.1967) and *Chicago Cutter-Karcher, Inc. v. Maley (In re Lord's, Inc.)*, 356 F.2d 456 (7th Cir.1965), *cert. denied*, 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966). In each case the Court found a simple

Debtor-Creditor relationship rather than a trust relationship between the lessor and the lessee.

**3.** The IRS is an "entity" as that term is defined in the Bankruptcy Code. "Entity" includes a "governmental unit." 11 U.S.C. § 101(14). A "governmental unit" means United States; ... department, agency, or instrumentality of the United States ..." 11 U.S.C. § 101(21).

made [§ 547(b)(2)]. The transfers were made within ninety days before the filing of the Petition [§ 547(b)(4)], so that the Debtor's insolvency on the date of transfer is presumed [§§ 547(b)(3) and 547(f)]. The parties did not present evidence to rebut this presumption of insolvency.

The payments made to the IRS enabled the IRS to receive more than it would have received had the transfers not been made and the IRS paid to the extent provided by the provisions of Chapter 7 of the Bankruptcy Code, as required by § 547(b)(5). The approved plan of reorganization provides for the liquidation of the Debtor's business and provides for a fifteen percent distribution to general unsecured creditors. Assuming a comparable distribution to general unsecured creditors in a Chapter 7 liquidation and assuming Debtor's debt to the IRS is measured by the full amount of the taxes embraced by the levy, (rather than by some lesser sum, as the amount of debt shown in Debtor's books), the IRS would receive approximately $3637.77 (15% of $24,251.78), if the transfers had not been made. With the transfers, the IRS would receive approximately $7887.77 ($5000 plus 15% of $19,251.78). All five elements of a preferential transfer having been proved, the transfer is recoverable by the Debtor-in-Possession unless it falls into one or more of the exceptions to avoidability set forth at 11 U.S.C. § 547(c).

The IRS contends that the payments were made in satisfaction of a debt secured by a statutory lien for taxes, transfers not avoidable by reason of the provisions of 11 U.S.C. § 547(c)(6).

§ 547(c)(6) excepts from the avoidance power of a Trustee, or Debtor-in-Possession, a transfer "that is the fixing of a statutory lien that is not avoidable under section 545 of this title." 11 U.S.C. § 547 permits the avoidance of certain kinds of statutory liens; however, statutory liens for unpaid taxes are *not* embraced by Section 545, so that they are *not* avoidable under 545, and a transfer that constitutes

the fixing of such statutory lien is not recoverable under 547(c)(6).

Nevertheless, the unassailable statutory lien must be a lien upon *property of the debtor,* a specific requirement of Section 545. Here, a statutory tax lien, embracing and encumbering *Debtor's property,* is not in existence.[4] The service of the Notice of Levy did not create such a lien, and the assailed payments are not made in payment of a debt secured by such a lien. In short, § 547(c)(6) has no application whatsoever.

Nevertheless, the two payments are not avoidable, it seems to me, by reason of the exception to avoidability found in 11 U.S.C. § 547(c)(2), which immunizes a transfer, otherwise voidable under § 547(b), which is

"(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms;"

Each of these elements (A through D) must be present to shield a transfer from the § 547(b) attack. Here, as has been stated earlier, Debtor's liability, its debt, to the IRS arose on May 1, 1980, when the Notice of Levy was served upon it. Payments were made within 45 days thereafter, so that element B and part of element A are present and satisfied.

Presence of the remaining elements depends on what is meant by (payment of) "a debt incurred in the ordinary course of business" [element A]; (a payment) "made in the ordinary course of business or financial affairs of the debtor and the transferee" [element C]; and (a payment) "made according to ordinary business terms" [element D].

None of these terms is defined by Section 547, or by any provision of the Bank-

---

**4.** The Government, in footnote 1 to its post-trial brief, at page 7, concedes that the debt due

Cheldon, levied upon, is not property of the Debtor.

ruptcy Code. None is to be construed, however, as requiring a new value [5] to be given to the Debtor at the time of the transfer or at the time the debt was incurred. The receipt of new value, by the Debtor, is not a condition, or element, of the § 547(c)(2) exception as it is expressly a condition, or element, of the exceptions found in § 547(c)(1), (c)(3) and (c)(4).

According to its legislative history, exception of § 547(c)(2) protects transfers in the ordinary course of business, the purpose of the exception being to leave undisturbed *normal* financial relations, because those normal financial relations do not detract from the general policy of Section 547 to discourage unusual action by either the debtor or its creditors during debtor's slide into bankruptcy. H.R.Rep. No. 595, 95th Cong., 1st Sess. 373; (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 88 (1978), U.S. Code Cong. & Admin.News 1978, p. 5787.[6]

The levy, as a remedy to *collect* delinquent taxes, is specifically permitted by 26 U.S.C. 6331 part of the Internal Revenue Code. Because of what is recognized to be an imperative public interest in favor of the prompt collection of tax delinquencies, the levy provisions of the Internal Revenue Code are to be liberally construed and applied. *United States v. Sullivan*, 333 F.2d 100 (3 Cir., 1964) and though the levy is a summary, non-judicial process substantially broader than anything known to the common law, *Sullivan*, supra, the existence of the power of levy is an essential part of our self-assessment tax system, and enhances voluntary compliance in the collection of taxes, the life-blood of government, their prompt and certain availability being an imperious need. *G.M. Leasing Corp. v. U.S.*, 429 U.S. 338, 350, 97 S.Ct. 619, 627, 50 L.Ed.2d 530 (1976).

All of which requires the conclusion that the service of the Notice of Levy, on the Debtor here, on May 1, 1980, which gives rise to Debtor's indebtedness to the Internal Revenue Service, occurred in the ordinary course of its (Service) business. Debtor's amenability to the reach of the levy arises from its contractual, business relationship with Cheldon, the delinquent taxpayer, a relationship existing in the ordinary course of its (Debtor's) business affairs, and a relationship by which a debtor-creditor relationship between Debtor and Cheldon comes into existence, which is the relationship which permits the employment of the tax collection process, to collect Cheldon's delinquencies, against the Debtor. Thus, the debt arising from the service of the Notice of Levy is incurred in the ordinary course of Debtor's business, also, it seems to me, and I so hold. So that element A of § 547(c)(2) has been satisfied.

The Notice of Levy contains and simultaneously constitutes a *demand* for payment,[7] consistent with the provisions of 26 U.S.C. 6332(a), which mandates the surrender of property or the discharge of obligations to the delinquent taxpayer (by pay-

---

**5.** "New value" is defined by § 547(a)(2) as "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, but does not include any obligation substituted for an existing obligation".

**6.** "The purpose of the preference section is twofold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter the 'race of diligence' of creditors to dismember the debtor before Bankruptcy furnishes the second goal of the preference section—that of equality of distribution." H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–178 (1977), U.S.Code Cong. & Admin.News 1978, p. 6138.

**7.** The Notice of Levy reads, in part: "... and demand is hereby made upon you for the amount necessary to satisfy this tax liability... Checks or money orders should be made payable to the Internal Revenue Service."

ment to the Internal Revenue Service) upon demand by the Secretary of the Treasury or his delegate. Responding to such demand, Debtor made the payments sought to be recovered, by checks dated and issued 5, and 8, days thereafter.

Obviously receipt of such payments, upon demand made, is in the ordinary course of business of the Internal Revenue Service. As, that is the response which is sought to be evoked by the collection process (found to be employed in the regular course of business). If so, Debtor's response, to that demand, within the short periods of time involved here, is made in the ordinary course of its business, also, it seems to me, so that element C of § 547(c)(2) has been satisfied.

There isn't anything in the Internal Revenue Code which specifically provides when the person, upon whom the Notice of Levy is served, is to respond by payment or surrender of property to the demand of the Levy. The substantive operative effect of the levy is immediate, and any liability incurred by reason of the service of the notice of levy continues indefinitely. Payment, then, within 5, or 8, days of receipt cannot, it seems to me, be said not to be according to ordinary business terms—so that element D of § 547(c)(2) has been satisfied, also.

Neither party has adduced evidence as to why Debtor made the two payments to the Internal Revenue Service, on May 6 and May 9, in response to the Notice of Levy, when it had not remitted the sums to Cheldon earlier, but subsequent to the lease termination on February 28.[8] Whether a justifiable reason in law or in fact exists is not material, in my judgment, because whether voidable preferential payments were made to the Internal Revenue Ser-

vice, or whether the exception of § 547(c)(2) applies to preclude recovery of those payments, depends upon Debtor's debt relationship to the Internal Revenue Service, arising by reason of the service of the Notice of Levy, *not* upon its debt relationship to its lessee, the delinquent taxpayer, Cheldon.

Accordingly, judgment by separate order being entered this date upon the Complaint is being entered in favor of the Defendant.

. . . .

■■ Defendant has filed a Counterclaim, in which it alleges that Debtor is holding $34,678.90 as the *bailee* of Cheldon, of which $30,447.38 has been levied upon.

The evidence does *not* disclose that the Debtor at any time has held, under the lease with Cheldon, funds derived from the sales of shoes and related accessories in any segregated form or account. The asserted bailment relationship has not been proved.

Accordingly, judgment by the separate order being entered this date, upon the Counterclaim, is being entered in favor of the Plaintiff.

■■■■■■■

---

8. The lease between Debtor and Cheldon required Debtor to account to Cheldon, on the 15th day of each month, for sales receipts had from the Cheldon operation during the preceding month (para. 4, Lease). Upon cancellation of the Lease, Debtor was to account to Cheldon for all sales receipts to cancellation [para. 18(d)]. In such event, the Lease did not provide for any other terms of settlement (than the 15th day of the month following cancellation), except that it permitted Debtor to withhold from payment, to Cheldon of the accounted for receipts, a reasonable sum not to exceed $1,000, for a period not to exceed 90 days following termination of the lease, to insure Cheldon's payment of liabilities to the Debtor under the Lease.