**In re CASCADE OIL COMPANY, INC., a Kansas corporation, Debtor.**

**Bankruptcy No. 82–10635.**

United States Bankruptcy Court, D. Kansas.

Aug. 2, 1985.

J. Eric Engstrom, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for applicant.

Gerald D. Lasswell, Stinson, Lasswell & Wilson, Wichita, Kan., for debtor.

Van Oliver, Arkin, Gump, Strauss, Hauer & Feld, Dallas, Tex., Michael L. Jones, Hershberger, Patterson, Jones & Roth, Wichita, Kan., for Official Creditors Committee.

Carol A. Park, Wichita, Kan., Asst. U.S. Trustee.

1. 11 U.S.C. § 102(1).

## MEMORANDUM OF DECISION

ROBERT B. MORTON, Bankruptcy Judge.

### FACTS AND NATURE OF THE CASE

Cascade Oil Company, Inc. (Cascade) received and accepted order conforming goods from Trident Steel Corporation (Trident) on May 5, 1982. On the same day Cascade issued check No. 1033 to Trident in the amount of $17,047.45 which was received by Trident on May 10, 1982. As was customary between the parties the check was post-dated (in this instance May 18, 1982). On May 7, 1982, Cascade filed its Chapter 11 petition herein. In conjunction with the filing Cascade, by letter, requested the Kansas State Bank & Trust Company (Bank) to stop payment on check No. 1033. That request was received by Bank on May 14, 1982. Nevertheless, the Trident check was inadvertently honored on May 19, 1982.

Prior to the improper payment of check No. 1033 the debtor-in-possession sent a post-petition check to the Internal Revenue Service (IRS). This first IRS check was dishonored. The account balance was then insufficient because credit had not been given for Cascade's deposit of a Clover Pipeline check. The latter item had not yet cleared. Upon an IRS demand for payment Cascade issued another check. It was after this second check was sent that Bank mistakenly honored the Trident check. The debit to the Cascade account for the Trident check so reduced the account balance that the second IRS check was dishonored.

Upon advice of counsel Cascade, on July 1, 1982, made a letter demand on Bank for immediate recredit of the $17,047.45. The demand was refused. Thereupon, at the instance of Bank, Cascade's president, Larry Kirkland, executed to Bank a single promissory note in the exact amount of the dishonored Trident check. The note proceeds were credited to the Cascade account. This transaction was completed on July 20, 1982 without 'notice and a hearing'[1] or Court approval; nor was debtor's

board of directors consulted. A provision in the note characterized the instrument as an "[i]nvoluntary extension of credit to reimburse for payment of check number 1033 on May 18, 1982 over stop-payment order dated May 14, 1982." The legal effect of the note is the central issue in this controversy.

Bank asserts two arguments: First, that under Kansas banking statutes Bank is subrogated to the rights of Trident; second, that the obligation evidenced by the promissory note should be given administrative priority by virtue of 11 U.S.C. § 364(a). In opposition Cascade maintains neither theory is tenable and that Bank is merely an unsecured creditor.

### ISSUES

The issues then may be stated as whether Bank (i) is subrogated to rights of Trident; (ii) should be accorded an administrative expense priority as a lender extending post-petition unsecured credit; or (iii) in the event neither of those determinations is affirmative, whether the debt should be on a parity with allowed unsecured claims.

### MEMORANDUM

■ Bank appears to shift its underlying premise according to the particular argument advanced in that the note transaction is inconsistently characterized. As stated in the facts, the promissory note signed by the corporate president [2] was denoted as an "[i]nvoluntary extension of credit to reimburse for payment of check number 1033...." On the one hand, Bank seems to argue that in effect it "recredited" debtor's account giving rise to subrogation rights. In its other argument Bank treats the note as evidencing a post-petition ordinary business loan entitled to administrative priority under section 364(a).

**2.** Kirkland's authority to sign the note appears to be unchallenged. It is noted that generally a corporation is bound if its officers are acting within their corporate powers. *Wilson v. Township of Salamanca,* 99 U.S. (9 OTTO) 499, 25 L.Ed. 330 (1878). Hence, even if Kirkland did

### Subrogation

The statutory right to stop payment of a check is alongside the statutory imposition on the customer of the burden of proving a consequential loss. Kansas Statutes Annotated § 84–4–403 (K.S.A.) provides:

> Customer's right to stop payment; burden of proof of loss. (1) A customer may by order to his bank stop payment of any item payable for his account but the order must be received at such time and in such manner as to afford the bank a reasonable opportunity to act on it prior to any action by the bank with respect to the item described in section 84–4–303.
>
> .    .    .    .    .
>
> (3) The burden of establishing the fact and amount of loss resulting from the payment of an item contrary to a binding stop payment order is on the customer.

*Id.* Subrogation is authorized by K.S.A. § 84–4–407:

> If a payor bank has paid an item over the stop payment order of the drawer or maker or otherwise under circumstances giving a basis for objection by the drawer or maker, to prevent unjust enrichment and only to the extent necessary *to prevent loss to the bank* by reason of *its payment of the item,* the payor bank shall be subrogated to the rights
>
> .    .    .    .    .
>
> (b) of the payee or any other holder of the item against the drawer or maker either on the item or under the transaction out of which the item arose....

*Id.* (emphasis supplied).

One prominent authority sees section 4–403(3) as "[s]trikingly inconsistent with the idea of subrogation under section 4–407." B. Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 2.6[2], at 2–52 (rev. ed. 1981). Noting that subrogation presupposes payment followed by stepping

not have express authority, as corporate president he had apparent authority. *Solomon R.R. Co. v. Jones,* 30 Kan. 601, 2 P. 517 (1883). Therefore, Bank had a right to assume he was acting for the corporation in signing the note.

into the shoes of the party paid the author continues:

> Section 4–407 would make more sense if the drawee bank had to recredit the customer's account before asking questions, just like a surety company in any other situation. But Section 4–403(3) indicates that subrogation will only be used by the bank after the drawer has been forced to sue it and has satisfied its burden of proof of loss, *unless the bank voluntarily recredits the account.*

Id. (emphasis supplied).

In the situation at hand Bank's 'customer,' Cascade, has not sued and it is very questionable indeed that Bank 'recredited' the account. In actuality the moneys were proceeds of the debtor-in-possession's post-petition note. In that sense no funds of the Bank itself were involved. But the subrogation theory is not apposite even if applied in the manner Bank suggests. The latter's argument runs thus:

> In the instant case, the debt was incurred May 5, 1982, the same date the check [dated May 18] was issued for payment of the debt and two (2) days prior to Cascade's filing of its bankruptcy petition. *But for the stop payment, Trident Steel would be entitled to the payment received,* as such payment did not constitute a voidable preference.

Bank's brief, Bankr. file document No. 608, at 3 (emphasis supplied). After making the conclusory statement that Bank's erroneous payment entitled it to subrogation, the argument continues:

> Again, Cascade found the goods acceptable and in conformance with its order to Trident Steel. (Stip. of Facts # 3) Cascade retained the goods once received. Cascade is obligated to pay Trident Steel the agreed price. To find otherwise would unjustly enrich Cascade. It follows, then, that the *Bank is entitled to the same payment* of the agreed price under its right of subrogation. Since, as shown previously, such pay-

ment does not constitute a voidable preference, the Bank is entitled to recovery of the agreed price, i.e. $17,047.45.

*Id.* at 4 and 5 (emphasis supplied).

■ The basic flaw in that analysis is the assumption that Trident could have forced full payment *after* Cascade's Chapter 11 case had been commenced. At that juncture of Cascade's insolvency the only manner in which Trident could have *compelled* a full recovery would have been by way of a ten-day seller's demand reclamation under K.S.A. § 84–2–702. Trident chose, rather, to rely on the post-dated check and was fortunate in that the item was paid through Bank's error. So, placement in the shoes of Trident avails Bank nothing. Trident has no surviving claim whatsoever against the ·debtor-in-possession or its estate. It is irrelevant that Cascade's payment of the invoice within 45 days would not have been a voidable preference under 11 U.S.C. § 547(c)(2).[3] In fact the transaction was concluded with a *postpetition* payment in full with funds ostensibly from Cascade but actually deriving from the 'loan' in question.

■ Nor would Bank fare any better through a subrogation to the debtor-in-possession's rights. Obviously Cascade has no claim against Trident. The subrogation theory just does not fit even if Bank's erroneous payment is treated as a 'recredit' to Cascade's account.

### Administrative Priority Under Code Section 364

A trustee is authorized to operate the business of the debtor under section 721 of the Code. This power includes the ability to obtain unsecured credit and to incur unsecured debt in the ordinary course of business. 11 U.S.C. § 364(a). A debtor-in-possession has the same authority. 11 U.S.C. §§ 1107(a), 1108. A debt incurred under section 364(a) is allowable as an ad-

---

**3.** In the event, there was no pre-petition payment here, preferential or otherwise. Cascade's Chapter 11 proceeding was commenced May 7, 1982. The check received by Trident three days *later* was dated May 18, 1982. Section 547(c)(2) as it stood when applicable to this case protected ordinary course transfers occurring within 45 days before the petition filing date. The 45-day requirement was eliminated by the 1984 amendments.

ministrative expense under section 503(b)(1)(A). Insofar as here pertinent those sections provide, respectively:

> If the trustee is authorized to operate the business of the debtor under section 721, 1108, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

11 U.S.C. § 364(a).

> After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
>> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case:

11 U.S.C. § 503(b)(1)(A).

A predominant theme of the Bankruptcy Code is equality of distribution among creditors. *See In re Multiponics, Inc.,* 622 F.2d 709, 721 (5th Cir.1980); *In re Richardson Dinner Theatre, Inc.,* 421 F.Supp. 423, 424 (N.D.Tex.1976). "If one claimant is to be preferred over others, the purpose should be clear from the statute." *In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976). "To give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution; it dilutes the value of the priority for those creditors Congress intended to prefer." *Id.* This administrative priority Code section is the only possible basis for placing Bank in a preferred position in respect of the note indebtedness.

■ An administrative expense receives a first priority because "[t]hose who must wind up the affairs of a debtor's estate must be assured of payment, or else they will not participate in the liquidation or distribution of the estate." H.Rept. No. 95–595, at 186–187, 95th Cong., 1st Sess. (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6146. This important purpose is limited by the policy of economy in the administration of bankruptcy cases. *Goldie v. Cox,* 130 F.2d 690 (8th Cir.1942).

Thus, not all claims for administrative expense are allowed. Such priority status will be granted only if there are policy, statutory or equitable bases therefor.

The priority gives protection to those administrating to and safeguarding the estate and constitutes something of a 'bargaining chip' for the debtor-in-possession. *See In re Glover, Inc.,* 43 B.R. 322 (Bankr.D.N.M. 1984). The purpose of this section is to induce the further extension of credit:

> The policies underlying the provisions of § 503 ... are not hard to discern. If a reorganization is to succeed, creditors asked to extend credit after the petition is filed must be given priority so they will be moved to furnish the necessary credit to enable the bankrupt to function.... Thus, "[w]hen third parties are *induced* to supply goods or services to the debtor-in-possession ... the purposes of [§ 503] plainly require that their claims be afforded priority."

*In re Jartran, Inc.,* 732 F.2d 584, 586 (7th Cir.1984) (emphasis in original) (quoting *In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976)). The court continued, "To serve the policy of the priority, inducement of the creditor's performance by the *debtor-in-possession* is crucial to a claim for administrative priority in the context of the furnishing of goods or services to the debtor." *Id.* at 587 (emphasis in original).

■ Section 364(a) clearly seems to contemplate voluntary borrowing by the debtor. The loan in question here appears far from voluntary on the part of debtor. Quite plainly debtor's president signed the corporate note only because Bank refused to recredit on its own; thus other funds were necessary to cover the outstanding IRS check. Significantly, the note was in the exact amount of the Trident check—$17,047.45. Obviously it is not the policy and purpose of section 364(a) to protect a bank which makes an error and then prevails upon the customer to sign a note to cover the mistake. Policy considerations here are *against* the granting of an administrative priority to Bank.

■ Moreover, credit obtained under section 364(a) must be incurred in the ordinary course of business. 11 U.S.C. § 364(a). The "ordinary course of business" generally refers to day-to-day business affairs.[4] *See In re Thomas W. Garland, Inc.,* 39 B.R. 412 (Bankr.E.D.Mo.1984); *In re Crowder,* 37 B.R. 53 (Bankr.S.D.Fla.1984). In *In re Economy Milling Co.,* 37 B.R. 914 (Bankr.D.D.C.1984), the court stated that "ordinary" was meant to "assure that neither the debtor nor the creditor do anything abnormal to gain an advantage over other creditors...." *Id.* at 922. Although the ordinary course of business for a bank includes the extension of credit the transaction in this case was not ordinary. *In re Amex Trading Co., Inc.,* 37 B.R. 793 (Bankr.W.D.Tenn.1984); *In re Schmidt,* 26 B.R. 89 (Bankr.D.Minn.1982). Bank improperly paid the check to Trident and did not correspondingly recredit the Cascade account. Later, in order to ensure proper payment of the IRS check, the debtor-in-possession acceded to an execution of a note in the exact amount of Bank's erroneous payment. Thus a debt was created which never would have been incurred but for Bank's mistake. The circumstances attending Bank's obtainment of the note, and indeed the unusual provisions in the note itself render the transaction *not* in the ordinary course of business. It was out of the ordinary course and to the trier of fact bespeaks an effort by Bank to protect itself at the expense of other creditors.

In considering relief of the type here requested, some decisions refer to the courts' equitable powers. "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). This Court perceives no ground for exercising this broad authority on Bank's behalf.

■ Finally to be noted is the provision in the Code for obtaining credit *outside* the ordinary course of business:

(b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

11 U.S.C. § 364(b). Notwithstanding the requirement of court approval prior to a post-petition borrowing, some courts have held that *nunc pro tunc* approval is within the equitable power of a court of bankruptcy. *In re Alafia Land Development Corp.,* 40 B.R. 1 (Bankr.M.D.Fla.1984); *Central States Corp. v. Luther,* 215 F.2d 38 (10th Cir.1954); *In re Avorn Dress Co., Inc.,* 79 F.2d 337 (2d Cir.1935). However, it is only in the setting of unusual circumstances that an unauthorized loan may receive an administrative expense priority retroactively.

The equitable test for this determination has been set out in *In re American Cooler Co., Inc.,* 125 F.2d 496 (2d Cir.1942):

> We think that the judge should not retroactively validate the loan unless he is confident that he would have authorized it if a timely application had been made, and unless, in addition, he is reasonably persuaded that the creditors have not been harmed by a continuation of the business made possible by the loan. He should also take into account, as bearing on the good faith of the debtor and lender, whether or not they honestly believed that they had authority to enter into the transaction. Of necessity, each case must stand on its own facts, and these criteria cannot be mechanically applied; they should, however, materially facilitate the preparation of an intelligent record.

*Id.* at 497. When the note here in question was signed the Chapter 11 petition had been on file for over two months and Bank is held to knowledge that Cascade then was subject to bankruptcy court control. The Court's misgivings concerning Bank's part in the irregular transaction have been ex-

---

**4.** There appear to be no decisions regarding the definition of "ordinary course of business" directly in relation to section 364(a). The Court incorporates definitions of the same phrase found in sections 363, 364(b), and 547.

pressed. By no means is it likely that a fully disclosed timely application for this loan would have been approved. This is not an occasion for equitable relief. Bank's debt is not entitled to priority—administrative or otherwise.

Finally, mention should be made of the possible subordination of Bank's debt to other allowed unsecured claims. In *In re Alafia Land Development Corp.*, 40 B.R. 1 (Bankr.M.D.Fla.1984), the Court stated:

> It is the opinion of this Court, despite the language cited from the 15th Edition of *Collier on Bankruptcy,* this is an incorrect statement of the law and that one who lends money to a debtor in possession without prior approval of the Court is not even entitled to the status of a general unsecured claim.... To hold otherwise is to jeopardize the integrity of administration of estates by debtors which is of paramount importance. To ratify unauthorized borrowings or out of the ordinary course of business transactions, except under the exceptional circumstances stated in *Avorn Dress, supra; American Cooler, supra* would create a dangerous precedent which may likely produce pernicious results, hostile and inimical to any legitimate and recognized goals and rehabilitative aims of the Bankruptcy Code.

*Id.* at 5.

■ Statutory recognition of equitable subordination is found at Code section 510(c):

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> > (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest....

11 U.S.C. § 510(c). Subordination has not been sought here and the Court does not find sufficient grounds for invoking the

doctrine *sua sponte.* Bank's claim shall be allowed on a parity with other allowed unsecured claims. An allowance of interest is precluded by equitable considerations combined with the determination that Bank is not a section 364(a) lender.

Judgment will be entered accordingly.

The foregoing memorandum constitutes findings of fact and conclusions of law as required by Bankruptcy Rule 7052 and Rule 52(a), Federal Rules of Civil Procedure.

---

* "Where the borrowing is out of the ordinary course of business and prior court authorization is not obtained the lender may be relegated to the status of a general unsecured creditor." 2 *Collier on Bankruptcy* ¶ 364.03, at 364-8 (15th ed. 1984).