**In re GREATER KANSAS CITY TRANSPORTATION, INC., Koontz Aviation, Inc., Toedman Cabs, Inc., M–C, Inc., d/b/a American Cab Company, Yellow Cab of Kansas City, Inc., Debtors.**

Bankruptcy Nos. 83–20538 and 83–20618 to 83–20621.

United States Bankruptcy Court, D. Kansas.

March 16, 1987.

Thomas M. Mullinix, of Evans & Mullinix, P.A., Kansas City, Kan., for debtors.

Frank Wendt, of Slagle & Bernard, Kansas City, Mo., Ernest N. Yarnevich, Kansas City, Kan., for Guaranty Nat. Ins. Co.

James S. Bird, of Polsinelli, White & Vardeman, Kansas City, Mo., for Hyman S. Golub & Co.

Carol A. Park, Wichita, Kan., Trustee.

## MEMORANDUM OPINION AND ORDER

BENJAMIN E. FRANKLIN, Chief Judge.

This matter came for hearing on October 7 and 8, 1986, on Guaranty National Insurance Company's application for the allowance of an administrative expense claim. Two parties filed objections: (1) The debtors-in-possession; and (2) Hyman S. Golub and Company. Guaranty National Insurance Company appeared by and through its attorneys, Frank Wendt and Ernest N. Yarnevich. The debtors-in-possession appeared by and through their attorney, Thomas M. Mullinix. Hyman S. Golub and Company appeared by and through its attorney, James Bird.

The Court ordered both parties to file simultaneous proposed findings of fact and conclusions of law. After receipt of timely proposed findings of fact and conclusions of law by Guaranty National Insurance Company and the debtors-in-possession, this Court is now prepared to rule on the administrative expense claim.

### FINDINGS OF FACT

1. Koontz Aviation, Inc. and Greater Kansas City Transportation, Inc. filed for relief under Chapter 11 of Title 11 of the United States Code on June 22, 1983. M–C, Inc., Yellow Cab of Kansas City, Inc., and Toedman Cabs filed for relief under Chapter 11 of Title 11 of the United States Code on July 19, 1983. The debtors operated a taxicab and delivery service.

2. The debtors entered into insurance agreements with Guaranty National Insurance Company (hereinafter "Guaranty National") for the policy periods of March 1, 1980 to March 1, 1981 (Policy No. EAL 80970); March 1, 1981 to March 1, 1982 (Policy No. EAL 90988); and March 1, 1982 to March 1, 1983 (Policy No. EAL 91431). Basically, the insurance agreements provided for the debtors to maintain a self-insurance program for losses up to $25,000 combined single limit per occurrence and Guaranty National to provide coverage above the self-insurance limit.

3. Policy No. EAL 80970 is the first of three excess coverage automobile liability policies issued by Guaranty National to Yellow Cab of Kansas City, Inc. The policy provides coverage for any claim or loss in excess of $25,000 for the policy period of March 1, 1980 to March 1, 1981. Yellow Cab of Kansas City, Inc. was an assured under the policy as a member of a taxicab pool covering numerous cab companies around the country. Yellow Cab of Kansas City, Inc. was included under the group of cab companies generally referred to as "Greater Omaha Transportation Co., et al." The operative terms of EAL 80970 are contained in pages 72–77 of Guaranty National's Exhibit A and provide in part as follows:

As respects each accident, Guaranty National agreed to indemnify the Insured against loss in excess of the applicable self-insured retention stated in the declarations, subject to the limit of liability stated in the declarations. *Guaranty National's Exhibit A*, pg. 72.

The insured was to be responsible for the investigation, settlement or defense of any claim made, or suit brought, or proceeding instituted against the insured, and was to furnish Guaranty National all copies of summons and pleadings filed in each suit and a complete investigation report of each claim or suit which was likely to involve liability of Guaranty National. *Guaranty National's Exhibit A*, pg. 76.

Under the endorsements of the policy, Guaranty National provided coverage of $475,000 combined and single limits in excess of a $25,000 combined and single limit self-insured retention.

4. As part of the overall self-insurance program, Guaranty National made public filings with various governmental agencies which issued the debtors operating permits. In effect, Guaranty National certified that

the company fully insured Yellow Cab of Kansas City, Inc.

5. Guaranty National noted its potential liability under the state filings and took steps to protect itself. Guaranty National required the insured to execute an indemnity agreement. Under this agreement, the insured agreed to indemnify Guaranty National for any amounts for which the insurance company could become liable under the state filings.

6. The indemnity agreement for policy No. EAL 80970 was made by and between Guaranty National and the members of the taxicab pool, including Yellow Cab of Kansas City, Inc. The agreement in part provided as follows:

WHEREAS, *GREATER OMAHA TRANSPORTATION CO., ET ALS, 2124 St. Mary's Ave., Omaha, Nebraska 68102* maintains a self-insurance program for indemnity payments on liability losses up to $25,000 Combined Single Limit per occurrence, Guaranty National Insurance Company of Denver, Colorado affords excess coverage above the self-insurance program, and State Commissions require filings for certifying automobile Bodily Injury Liability and Property Damage Liability, the parties hereto agree as follows:

1. Guaranty National Insurance Company will make the required filing with states where necessary.

2. To the extent of their $25,000 Combined Single Limit per occurrence self-insurance program, *GREATER OMAHA TRANSPORTATION COMPANY, ET ALS, 2124 St. Mary's Avenue, Omaha, Nebraska 68102* will indemnify and hold Guaranty National Insurance Company harmless from any loss, costs or expenses for which it may be liable as a result of the state filings.

3. This agreement shall be effective from March 1, 1980, and for the duration of the current policy issued by Guaranty National Insurance Company, plus renewals or extensions thereof.

The Indemnity Agreement was signed by an employee of Guaranty National and by Jerry Wilson as President of "Greater Omaha Transportation Co., et al." on behalf of the insureds.

7. Policy No. EAL 90988, issued for the policy period of March 1, 1981 to March 1, 1982, renewed policy No. EAL 80970. The operative terms contained within policy No. EAL 90988 are identical to the terms discussed earlier in policy No. EAL 80970 (*see Guaranty National's Exhibit C*). Policy No. EAL 90988 also listed as the assured "Greater Omaha Transportation Co., et al." and specifically included Yellow Cab of Kansas City, Inc. as part of the group. The insurance coverage provided by policy No. EAL 90988 was the same as policy No. EAL 80970: $475,000 combined single limit coverage in excess of a $25,000 combined single limit self-insured retention. As a renewal of policy No. EAL 80970, Guaranty National issued public filings as required by the Indemnity Agreement contained in Guaranty National's Exhibit B.

8. Policy No. EAL 91431 for the policy period of March 1, 1982 to March 1, 1983, is the third excess coverage automobile policy issued by Guaranty National (*Guaranty National's Exhibit D.*) Guaranty National issued the policy to "Yellow Cab of Kansas City, Inc., et al." which included Yellow Cab of Kansas City, Inc., Greater Kansas City Transportation Company, Terminal Cab Company, Yellow Cab Limousine, Toedman Cab Company, Inc., Koontz Aviation, Inc., M–C, Inc., and the "additional insured", Aviation Department, Kansas City, Missouri. Policy No. EAL 91431 is a renewal of policy No. EAL 90988. The operative terms are identical. As a renewal of policy No. EAL 90988, the underlying limits of primary insurance in policy No. EAL 91431 was $25,000 combined single limit self-insured retention and the total limit, primary and excess combined, was $500,000. Also included within the terms of policy No. EAL 91431 is an indemnity agreement identical with the indemnity agreement discussed in connection with policy Nos. EAL 80970 and EAL 90988. The agreement is effective from February 1, 1982. The indemnity agreement con-

tained within policy No. EAL 91431 applied to that policy and for one month of the policy period for policy No. EAL 90988. This new agreement was apparently necessary because Yellow Cab of Kansas City, Inc. changed ownership around this time.

9. To complicate matters even more, if that is possible, Guaranty National actually issued separate policies to conform with the public filings that were made for the period of March 1, 1981 to March 1, 1982, and for the period of March 1, 1982 to March 1, 1983.

10. Guaranty National first issued policy No. GLA 051001 to conform with the public filings for the period of March 1, 1981 to March 1, 1982. GLA 051001 states coverage as bodily injury liability of $100,000 each person, $300,000 each occurrence, and property damage liability of $50,000 each occurrence (*Guaranty National's Exhibit E*). The coverage conforms with the public filings. The charge for policy No. GLA 051001 was a $250 handling fee.

11. Policy No. GLA 051002 is the second policy issued to conform with the public filings and is a renewal of policy No. GLA 051001 for the period of March 1, 1982 to March 1, 1983 (*Guaranty National's Exhibit F*).

12. Policy Nos. GLA 051001 and GLA 051002 contained an indemnity agreement between Guaranty National and "Yellow Cab of Kansas City, Inc., et al." executed by Robert Christine on May 7, 1982. The agreement provided in part as follows:

1. Guaranty National Insurance Company will issue its policies, GLA 051001 providing a $100,000 Per Person and $300,000 Per Occurrence Limit of Bodily Injury Liability and $50,000 Per Occurrence Limit of Property Damage Liability.

2. Yellow Cab of Kansas City, Inc., et al, will indemnify and hold Guaranty National Insurance Company harmless from any loss, costs or expenses for which it may be liable under its policies GLA 051001 and GLA 051002 issued to Yellow Cab of Kansas City, Inc., et al.

3. This agreement shall be effective from March 1, 1981, and for the duration of policies GLA 051001 and GLA 051002 issued by Guaranty National Insurance Company, plus renewals or extensions thereof.

13. These policies, GLA 051001 and GLA 051002, were more form than substance. Any claims filed between March 1, 1981 to March 1, 1983, were to be handled under the self-insured retention program and policies Nos. EAL 90988 and EAL 91431 rather than under policies Nos. GLA 051001 and GLA 051002.

14. Guaranty National also issued to a few of the entities what is referred to as "tail policies." These policies are separate and distinct from the self-insured policies discussed earlier. Guaranty National issued tail policy No. GLA 052868 to M–C, Inc., d/b/a American Cab Company for the policy period of September 14, 1982 to September 14, 1984 (Guaranty National's Exhibit H). Tail policy No. GLA 052426 was issued to Toedman Cab Company, Inc. for the policy period of September 14, 1982 to September 14, 1984 (*Guaranty National's Exhibit G*). The insurance coverage under tail policies Nos. GLA 052868 and GLA 052426 was for losses which had occurred prior to September 14, 1982, that are reported during the policy period. Guaranty National issued the policies for a $500 premium. The policies both contain agreements to indemnify and hold harmless Guaranty National for any loss, cost, or expense for which Guaranty National pays under the policies. Guaranty National cancelled policies Nos. GLA 052868 and GLA 052426 upon the debtors-in-possession's request effective September 22, 1983.

15. All of the insurance policies in the self-insured retainage program terminated on their terms on March 1, 1983. Prior to March 1, 1983, Guaranty National notified the insurance commissioners of the State of Kansas and State of Missouri, the Taxi-Cab Director for the City of Kansas City, Missouri, and other public entities that Guaranty National would no longer provide liability insurance coverage to any of the debtors after March 1, 1983. The debtors

obtained insurance coverage from Great American Insurance Companies beginning on March 1, 1983.

16. As noted earlier, debtors filed for relief under Chapter 11 of Title 11 of the United States Code in the summer of 1983. On September 4, 1983, Robert L. Christine, President of Yellow Cab of Kansas City, Inc. sent a letter to Carl Wakefield, Vice-President of Guaranty National. The letter stated:

> On June 22, 1983, Yellow Cab of Kansas City, Inc., encompassing American Cab, Toedman and Terminal, filed for reorganization under Chapter 11 of the Bankruptcy Act in the Federal Court in Kansas City, Kansas. Until a plan of reorganization is filed, we are forbidden from paying any post filing claims by the Federal Court. This plan may not be impacted for some six months. In any event, the Court stayed all actions on lawsuits, etc.; however, recently the Court has released some claims to continue with their lawsuits. Some of these, of course, can be settled for 25¢ on the $1.00, but we are not in a position to do so, and the Court will not allow us to do so.
>
> Vance Preman, an excellent attorney, representing both Yellow Cab and Guaranty, has all the cases at his fingertips and is aware of those claims with problems and the severity of each. We thought it to everyone's best interest for

you to contact Vance direct at (816) 471–1060, 500 Traders National Bank Building, 1125 Grand Avenue, Kansas City, Missouri 64106, and go over a plan of action with him.

> Feel free to contact myself, Vance or Tom Mullinix, (913) 621–1200, the bankruptcy lawyer, at your convenience.
>
> We thought you should be made aware of this situation as quickly as possible.

17. After receiving the letter of September 9, 1983, Guaranty National made arrangements to secure the claim files from Yellow Cab and their local counsel. The attorney for the debtors handling the self-insured retainage program turned approximately 100 outstanding claim files for Yellow Cab of Kansas City, American Cab, Toedman and other related companies over to Guaranty National.

18. After receipt of the claim files, Guaranty National began paying and settling the claims which arose during the effective dates of the various policies. The actual claims arose, or, in other words the losses occurred, pre-petition. In fact, Guaranty National only paid and settled on losses which occurred prior to March 1, 1983, because the last policy terminated on that date.

19. Under all of the policies, including the tail policies, Guaranty National claims to have made the following payments:

| POLICY NUMBER | LOSS PYMTS | EXCESS OF $25,000 | NET LOSS | LEGAL/ LAE | INCURRED |
|---|---|---|---|---|---|
| EAL 80970 | $94,050.53 | $2,500.00 | $91,550.53 | $17,222.05 | $108,772.58 |
| EAL 90988 | $186,055.17 | $5,500.00 | $185,555.17 | $3,707.50 | $189,262.67 |
| EAL 91431 | $190,283.13 | $10,000.00 | $180,283.13 | $9,326.54 | $189,609.67 |
| GLA 52426 | $4,016.43 | $0.00 | $4,016.43 | $82.50 | $4,098.93 |
| GLA 52868 | $2,500.00 | $0.00 | $2,500.00 | $1,067.60 | $3,567.60 |
| TOTALS | $476,905.26 | $18,000.00 | $463,905.26 | $31,406.19 | $495,311.45 |

ADMINISTRATIVE EXPENSE

| | NO. | HRS. | COST | |
|---|---|---|---|---|
| 113 Claims with Loss | 113 | 3.0 | $30.00 | $10,170.00 |
| 39 Claims with No Loss | 39 | 1.5 | $30.00 | $1,755.00 |
| TOTAL COSTS | | | | $507,236.45 |

*(See Guaranty National's Exhibit J)*

20. Guaranty National filed its proof of claim on August 6, 1986, the last day for filing proof of claims.

## ISSUE OF LAW

WHETHER GUARANTY NATIONAL'S POST–PETITION PAYMENTS OF PRE–PETITION CLAIMS UNDER THE INSURANCE POLICIES ARE ADMINISTRATIVE EXPENSES UNDER SECTION 503(b)(1)(A).

## CONCLUSIONS OF LAW

Guaranty National's argument for administrative expense status is four-fold and is as follows: (1) The contracts of insurance between the debtors and Guaranty National are executory contracts which may be assumed or rejected by the trustee or debtor-in-possession under section 365(a); (2) the debtors assumed by implication the insurance contracts by their actions in turning the claims over to Guaranty National and in not rejecting the contracts during the time Guaranty National paid the claims; (3) Guaranty National is entitled to administrative expense priority for paying the claims; (4) even if the Court held that the parties must first get explicit court approval to assume an executory contract, Guaranty National is still entitled to administrative expense status because their claim arose following the filing of the reorganization petitions and prior to rejection of the insurance contracts by the debtors.

This Court finds Guaranty National's contentions to be seriously flawed. The claimant erroneously assumes that there is an executory contract in the first place. In addition, the claims fail to fall within the terms and policies underlying a section 503(b)(1)(A) claim. Since the analysis is slightly different for the claims which arose under the self-insured retainage program (policies Nos. EAL 80970, EAL 90988, EAL 91431) and for the claims which arose under the tail-policies (policies Nos. GLA 52426 and GLA 52868), the Court will analyze the policies separately.

A. PAYMENTS ON CLAIMS UNDER THE SELF–INSURED RETAINAGE PROGRAM (Policy Nos. EAL 80970, EAL 90988, and EAL 91431).

■ Guaranty National's contention that the payment on claims under policy Nos. EAL 80970, EAL 90988, and EAL 91431 amounts to an administrative expense under section 503(b) is based in large part on the assumption of an executory contract under section 365(a). The claimant has spent a great deal of time and effort in its briefs arguing that the insurance contracts are executory under section 365(a), that the debtors-in-possession impliedly assumed an executory contract, and that prior court approval is not needed to assume the contract.

First, this Court finds that there is no executory contract regardless of whether or not the debtors' actions constitute assumption and regardless of whether the Court must approve such an assumption. The debtors filed their petitions in bankruptcy in June and July of 1983. The last policy, No. EAL 91431, terminated on its face on March 1, 1983. Prior to March 1, 1983, Guaranty National notified the insurance commissioners of the State of Kansas and the State of Missouri, the Taxicab Director for the City of Kansas City, Missouri, and other public entities that Guaranty National would no longer provide liability insurance coverage for any accidents that occur to any of the debtors after March 1, 1983. Therefore, on the date of the filing of the petition, there was no existing contract to assume or reject. *In re Waterkist Corp.*, 775 F.2d 1089 (9th Cir.1985); and *In re Hospitality Associates*, 6 B.R. 778 (Bankr.D.Or.1980).

■ Secondly, this Court finds that the claimant's contentions totally miss the point, and, as one objecting creditor aptly stated, "amount to a smokescreen" obscuring the true issue in this case: Are Guaranty National's post-petition payments of *pre-petition claims* an administrative expense under section 503(b)(1)(A)?

Section 503(b) governs the allowance of administrative expenses and, in part, states:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

11 U.S.C. § 503(b)(1)(A).

The Seventh Circuit Court of Appeals articulated the underlying policies of section 503(b)(1)(A) in *In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir.1984) (footnotes omitted), and stated:

It is well settled that expenses incurred by the debtor-in-possession in attempting to rehabilitate the business during reorganization are within the ambit of § 503. *See Reading Co. v. Brown*, 391 U.S. 471, 475, 88 S.Ct. 1759, 1761, 20 L.Ed.2d 751 (1968) (construing predecessor to § 503). Appellants claim that, because the ads involved in the case were not published until after the "commencement of the case" and presumably aid Jartran in its efforts to rejuvenate its business, the cost of those ads should be treated as an administrative expense. As an administrative expense, the fees for the ads would be afforded priority ahead of certain pre-petition creditors.

The policies underlying the provisions of § 503 (and its predecessor, § 64(a)(1)) of the Bankruptcy Act, 11 U.S.C. § 104(a)(1) (1976) are not hard to discern. If a reorganization is to succeed, creditors asked to extend credit after the petition is filed must be given priority so they will be moved to furnish the necessary credit to enable the bankrupt to function. *See In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976) (Coffin, Chief Judge). Thus, "[w]hen third parties are *induced* to supply goods or services to the debtor-in-possession ... the purposes of [§ 503] plainly require that their claims be afforded priority." *Id.* (emphasis added; footnote omitted). Without a provision like § 503, efforts to reorganize would be hampered by the necessity of advance payment for all goods and services supplied to the estate since presumably no creditor would willingly assume the status of a non-priority creditor to a debtor undergoing reorganization.

This involves no injustice to the prepetition creditors because it is for their benefit that reorganization is attempted. If reorganization successfully rehabilitates the debtor, presumably the pre-petition creditors will be better off than in a liquidation. *See Reading Co. v. Brown*, supra, 391 U.S. at 478, 88 S.Ct. at 1763. However, because priority should not be afforded unless it is founded on a clear statutory purpose, if the appellants' claim does not comport with the language and underlying purposes of § 503, their claim must fail. *See In re Chicago, Milwaukee, St. Paul & Pacific Railroad*, 658 F.2d 1149, 1163 (7th Cir.1981) (general rule is equality of distribution; deviation must appear in the statute), cert. denied, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982). Any preference for claims not intended by Congress to have priority would dilute the value of the intended priority and thus frustrate the intent of Congress. *Id.; In re Mammoth Mart, supra,* 536 F.2d at 953.

The First Circuit Court of Appeals in *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976), the case in which *Jartran* relied upon, established a two-part test for determining whether a debt should be afforded administrative priority. Under the test, a claim is afforded priority if the debt both (1) "arise(s) from a transaction with the debtor-in-possession" and (2) is "beneficial to the debtor-in-possession in the operation of the business." *Id.* at 954. *See also In re Jartran, supra,* 732 F.2d at 587. The bankruptcy courts in the District of Kansas follow the *Mammoth* and *Jartran* line of cases. *See In re Cascade Oil Company, Inc.*, 51 B.R. 877 (Bankr.D.Kan.1985).

As such, the first sub-issue is whether the Guaranty National claim arose from a transaction with the *debtors-in-possession*. The answer is clearly no. The Court has already addressed this question in analyzing Guaranty National's contention that the agreements were executory contracts.

The original losses on which Guaranty National bases its claims occurred prior to the debtors filing bankruptcy. The last insurance policy, EAL 91431, lapsed on March 1, 1983, three months prior to the filing of the petition. Obviously, Guaranty would not be obligated or willing to administer any claims which arose after the lapse of the policy period. The claims clearly are against the debtors as pre-petition entities, not against the debtors as debtors-in-possession, and arose under insurance policies contracted with the debtors pre-petition.

This Court further finds that the debtors-in-possession did not *induce* Guaranty National to pay the claims. *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976) ("to serve the policy of the priority, inducement of the creditor's performance by the *debtor-in-possession* is crucial to a claim for administrative priority in the context of the furnishing of goods or services to the debtor.") Guaranty National paid the claims because it felt compelled to do so under the certificates of insurance filed with the public agencies under the insurance agreements. At the time Guaranty National paid the claims, they did not expect to get administrative expense priority. The timing of the filing of their proof of claim demonstrates this point. Guaranty National filed its proof of claim on August 6, 1986, and only after it appeared that the estate may have substantial funds. On March 28, 1985, this Court authorized Air Cargo Terminals, Inc. to sell the metal hangar building, dock and leasehold interest to the Kansas City-Wyandotte County Port Authority for the price of $595,000. Guaranty National's application for administrative expense appears to be only an after-thought in hopes of sharing in the funds.

The next sub-issue is whether Guaranty National conferred any benefit on the debtors-in-possession in the operation of the business. Again, the answer is no. As stated earlier, the claims paid by Guaranty National were all on pre-petition accident claims. These pre-petition accident claimants would, at best, have held *unsecured claims* against the bankruptcy estate rather than administrative expense claims.

This Court cannot see how a third party paying off unsecured claims can give rise to an administrative expense claim. Guaranty National's claims could not possibly be any greater than those of the original claimant.

In the final analysis, Guaranty National's claim failed to come within the ambit of section 503(b)(1)(A). The payments of pre-petition accident claims are not *"actual, necessary costs and expenses in preserving the estate."*

B. PAYMENTS ON CLAIMS UNDER THE TAIL POLICIES (Policy Nos. GLA 052426 and GLA 052868).

Guaranty National also applies for administrative expense status for claims paid under the tail policies. Due to the small amount of claims paid under tail policy as compared with the claims paid under self-insured retainage program, the parties appear to have spent little time or effort analyzing these payments under section 503. In fact, the debtors-in-possession appear to concede to Guaranty National that the payments are administrative expenses.

This Court, however, disagrees with the parties and finds that these payments also fail to come within the parameters of section 503(b)(1)(A). The claim under the tail policies did not arise from the transaction with the debtor-in-possession. *See In re Mammoth Mart, Inc.*, 536 F.2d 450 (1st Cir.1976), and *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir.1984). Again, Guaranty National's claim arose from insurance policies contracted with the debtors pre-petition. All the operative acts and legal relationships occurred pre-petition. Furthermore, Guaranty National's payment of claims under the tail policies failed to confer any benefit on the debtors-in-possession in the operation of the businesses. *Id.* These pre-petition accident claimants would also have held unsecured claims rather than administrative expense claims. The payments of any pre-petition accident claims are not actual, necessary costs and expenses in preserving the estate. Guaranty National's claims could not possibly be greater than those of the original claimant.

## ORDER

IT IS THEREFORE, BY THE COURT, ORDERED That the debtors-in-possession objection and Hyman S. Golub and Company's objection to Guaranty National Insurance Company's application for administrative expense claim are sustained and that Guaranty National Insurance Company's application for administrative expense claim be and the same is hereby denied.

IT IS FURTHER, BY THE COURT, ORDERED That Guaranty National Insurance Company's claim be allowed as unsecured.