**In re ECONOMY MILLING COMPANY, INC., Debtor.**

**Kevin CAMPBELL, Trustee, Plaintiff-Appellee,**

**v.**

**William CANNINGTON, Defendant-Appellant.**

**Civ. A. No. 82–222–6.**

United States District Court, D. South Carolina, Aiken Division.

Feb. 4, 1983.

Daniel A. Speights, Hampton, S.C., for Cannington.

H. Flynn Griffin, III, Walterboro, S.C., for Campbell.

SIMONS, Jr., Chief Judge.

This is an action by the trustee in bankruptcy for Economy Milling Company, Inc., (debtor), to recover two payments of One Thousand Dollars ($1,000.00) each made to the appellant, William Cannington, during the ninety (90) days immediately preceding the filing of the debtor's petition in bankruptcy. The matter was heard in the Bankruptcy Court where judgment was entered in favor of the trustee. The bankruptcy court held that the transfers complained of were avoidable not only as preferential transfers under 11 U.S.C. § 547, but also under the provisions of 11 U.S.C. § 544. While the appeal of this decision was pending the appellant moved this court to remand the case to the bankruptcy court so that some after-discovered evidence could be considered by that court. This court remanded the case for that purpose. After a re-hearing the bankruptcy court denied the appellant's motion for relief of judgment finding the new evidence unpersuasive. The matter is now before this court upon the appellant's appeal of the order of judgment and the order denying the defendant's motion for relief of judgment.

The record shows that in the latter part of May 1980 the appellant, by mutual agreement with the debtor, delivered approximately five hundred (500) bushels of corn to the warehouse of the debtor. There is evidently some dispute as to the exact nature of the agreement between the parties. The appellant has testified that the agreement was for him to retain ownership

of the corn for two months while it was stored by the debtor, then the debtor would either pay for the corn or return it to the appellant. The debtor's general manager, however, testified that the debtor *purchased* the corn from the appellant on credit in May 1980 with payments to be made at some indeterminate time in the future. At trial the appellant admitted that no notice of this agreement was filed with the clerk of court for the county in which the debtor was located. The record further shows that the debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Act on October 19, 1980.

The bankruptcy court found that the two payments constituted preferential transfers because they met the five elements required of preferences specified in § 547(b). That is to say that they were found to be transfers (1) for the benefit of a creditor; (2) on account of an antecedent debt; (3) made while the debtor was insolvent; (4) within ninety (90) days before the debtor filed his voluntary petition for relief and (5) that these transfers enabled the appellant to receive a greater recovery than he would have received had the transfer not been made and a bankruptcy liquidation occurred. The bankruptcy court also ruled that the exceptions to § 547(b)'s provisions found in § 547(c)(1)[1] and § 547(c)(2)[2] were inapplicable. Further, the bankruptcy court ruled that the trustee was also empowered to recover the questioned payments under the provisions of 11 U.S.C. § 544(a)(1) which grants the trustee the rights and powers of a hypothetical lien creditor of the debtor as of the date the petition is filed.[3]

The appellant has based his appeal from the bankruptcy court's ruling on several grounds. The appellant has objected to the bankruptcy court's finding that the debtor was insolvent at the time of the transfers merely because the appellant failed to present any evidence to rebut the presumption of insolvency set forth in 11 U.S.C. § 547(f).[4] The appellant argues that utilizing the presumption found in that section to hold the debtor insolvent in this particular case would be unreasonable and arbitrary. He further claims that *Western and Atlantic Railroad v. Henderson*[5] proscribes the use of unreasonable or arbitrary presumptions as being violative of the Due Process Clause of the Fourteenth Amendment and hence § 547(f)'s provision is invalid.

The appellant's trust in *Henderson,* however, is misplaced as the Supreme Court has, in a series of decisions, directly and implicitly found the use of presumptions such as the one in § 547(f) constitutionally permissible. In *Mobile, Jackson, and K.C. R.R. Co. v. Turnipseed,*[6] the Supreme Court first established the test by which the constitutionality of presumptions must be judged. *Turnipseed* involved a Mississippi statute that made proof that an injury had been caused by the running of locomotives or their cars, *prima facie* evidence of negligence on the part of the railroad company. The Court sustained the constitutionality of the statute by giving birth to the so-called "Rational Connection" test:

> The only legal effect of this inference is to case upon the railroad the duty of producing some evidence to the contrary.... The statute does not ... fail in due process of law because it creates a property on which a creditor on a simple contract would have obtained a judicial lien, whether or not a creditor exists."

---

1. See note 23 *infra.*

2. See note 24 *infra.*

3. Section 544(a): "The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all

4. Section 547(f): "For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition."

5. 279 U.S. 639, 49 S.Ct. 445, 73 L.Ed. 884 (1929).

6. 219 U.S. 35, 31 S.Ct. 136, 55 L.Ed. 78 (1910).

presumption of liability, since its operation in only to supply an inference of liability in the absence of other evidence contradicting such inference. . . . [I]t is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate. . . . From the foregoing considerations it must be obvious that the application of the act to injuries resulting from "the running of locomotives and cars" is not an arbitrary classification, but one resting upon considerations of public policy, arising out of the character of the business.[7]

Admittedly, the Supreme Court in *Henderson* nineteen years after *Turnipseed* seemed to do a complete about face in their attitude towards presumptions. *Henderson,* like *Turnipseed,* involved a state statute raising a presumption of negligence against the defendant merely from proof of the fact of an injury caused by a train. Here, however, the Court used the rational connection test to *strike down* the statute reasoning that:

> The mere fact of a collision between a railway train and a vehicle at a highway grade crossing furnishes no basis for any inference as to whether the accident was caused by negligence of the railway company, or of the traveler on the highway, or both, or without the fault of anyone. Reasoning does not lead from the occurrence back to its cause. And the presumption was used to support conflicting allegations of negligence.[8]

The Court distinguished *Turnipseed* on the grounds that in *Turnipseed* the Mississippi statute merely created a temporary inference of fact that would vanish as soon as the opposing party introduced *some* evidence to the contrary while the Georgia statute in *Henderson* raised the value of the presumption to the level of evidence to be weighed against opposing testimony and which would prevail unless the opposing testimony was "found by the jury to preponderate."[9] In other words the Georgia statute failed because it shifted the traditional burden of proof in negligence actions

7. *Id.* at 43–44, 31 S.Ct. at 138, 55 L.Ed. at 80–81.

8. *Henderson,* 279 U.S. at 643–44, 49 S.Ct. at 447–48, 73 L.Ed. at 888–89.

9. Unfortunately, the court's attempt to distinguish *Henderson* and *Turnipseed* has led to great confusion in understanding the rational connection test and has caused several commentators to throw up their hands in bewilderment. *See, e.g.,* I J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE, 301–22 (1975) ("The two cases have proved exceedingly difficult, if not impossible, to reconcile.") and NOTE, "Constitutionality of Rebuttable Statutory Presumptions," 55 Colum.L.Rev. 527, 537, n. 32 (1955) ("*Henderson* has proved the most puzzling case in the line of Supreme Court decisions dealing with the constitutionality of presumptions.") The confusion arises from the fact that the court said the Mississippi statute was invalid because it violated the rational connection test, but the true reason the court struck the statute was because the statute's presumption adopted the "California heresy" of according presumptions the weight of evidence rather than following the more acceptable "Bursting Bubble" theory which held that presumptions vanish in the face of *any* contra evidence.

It is elementary that if the invalidity of the presumption in *Henderson* arose because of a failure to demonstrate a rational connection between the proven fact (a car/train accident) and the presumed fact (negligence on the part of the train company caused the accident) then the *Turnipseed* statute must fall as well since the proven fact and presumed fact were practically the same. The court added further to the confusion by admitting the sameness of the two statutes: "Each one of the state enactments raises a presumption from the facts of the injury caused by the running of locomotives or cars." The Court then went on to correctly state the real difference between the two statutes by noting the differing procedural results of their application. The *Henderson* statute shifted the burden of proof from the party offering the presumption to the party opposing it; while the *Turnipseed* statute merely required the party opposing the application of the presumption to come forward with some evidence, not necessarily a preponderance, to rebut the presumption, whereupon the presumption would no longer have *any* evidentiary value.

involving railroad companies from the plaintiff to the defendant.

The Court's decision four years later in *Atlantic Coast Line R. Co. v. Ford*,[10] served to further explain the *Turnipseed/Henderson* dichotomy. In *Ford* there was a South Carolina statute that created a rebuttable presumption of proximate cause from proof that a train failed to give a warning by ringing a bell or sounding a whistle at a grade crossing. The Court upheld the statute for two reasons: First, the Court held that there was a rational connection between the proved fact and the presumed fact (adding to the confusion over the supposed failure of the rational connection test in *Henderson*) and, second, state court decisions had given the statute the effect required by *Turnipseed*:

> ... namely that the legal effect of the presumption was to cast upon the railroad company the duty of producing some evidence to the contrary, whereupon the inference was at an end, and the question became one for the jury upon all the evidence ...[11]

Indeed the *Turnipseed* type presumption has been reaffirmed as constitutionally sound as recently as 1976 in *Usery v. Turner Elkhorn Mining Co.*[12] In *Usery* the Court considered the constitutionality of the presumption found in § 411(c)(4) of the Federal Coal Mine Health & Safety Act [13] that a miner who has worked in underground mines for fifteen years and who is able to present evidence demonstrating a totally disabling respiratory impairment, shall be rebuttably presumed to be totally disabled by pneumoceniosis. In upholding the constitutionality of the statute the Court cited the rational connection language from *Turnipseed* and further advised that:

The process of making the determination of rationality is, by its nature, highly empirical, and in matters not within specialized judicial competence or completely commonplace, significant weight should be accorded the capacity of Congress to amass the stuff of actual experience and cull conclusions from it.[14]

Using the seminal explanation of the rational connection test found in *Turnipseed* this court finds that the presumption in § 547(f) meets the rigors of that test. The only legal effect of this presumption of insolvency during the ninety days prior to a debtor filing a petition for relief is to require the creditor to produce *some* evidence to the contrary. It does not deny the creditor of a bankrupt due process because its operation is only to supply an inference of insolvency in the absence of evidence contradicting the inference. The presumed fact of insolvency during the ninety (90) days before the filing of a petition is rationally related to the proven fact of insolvency at the date of filing. That is to say that businesses that fail are usually insolvent for sometime before they file for relief; and, if Congress presumes this period of pre-filing insolvency to be ninety (90) days it is not up to this court to challenge that determination. Congress has the resources to make such a determination that this court lacks.[15] Finally it must be obvious that setting a ninety (90) day period of presumed insolvency prior to filing is neither arbitrary, nor unreasonable, but is, instead, a necessary and natural assumption in light of the transaction itself and the public policy supporting the bankruptcy statute.

Code § 547(f) is also free of the infirmities that proved fatal to *Henderson*.[16] The legislative history to Code § 547(f) makes it clear that the presumption in that section

10. 287 U.S. 502, 53 S.Ct. 249, 77 L.Ed. 457 (1933).

11. *Id.* at 507, 53 S.Ct. at 251.

12. 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).

13. 30 U.S.C. § 921(c)(4) (1980).

14. 428 U.S. at 28, 96 S.Ct. at 2898, 49 L.Ed.2d at 774 citing *U.S. v. Gainey*, 380 U.S. 63, 67, 85 S.Ct. 754, 757, 13 L.Ed.2d 658 (1965).

15. *See* text accompanying note 14, *supra.*

16. This court does not feel the same freedom as does apparently appellee' counsel and Professor McCormick in dismissing *Henderson* as no longer virile. Professor McCormick bases his conclusion that *Henderson* is of questionable

does not shift the burden of proof from the party asserting it to the party opposing it as did the statute in *Henderson*.[17] Rather, Code § 547(f) merely requires the party opposing its application to come forward with *some* evidence to rebut the presumption. Hence this court finds the appellant's claim that Code § 547(f) is unconstitutional as applied here to be meritless.

█ This leads to the appellant's second objection to the Bankruptcy Court's ruling: his claim that the presumption of insolvency was rebutted. This court finds, with the bankruptcy court, that the facts elicited by the appellant on cross-examination were insufficient to place the presumption of insolvency in doubt.[18] The evidence presented at trial established that the liabilities of the debtor at the time in question totalled four-hundred and twenty-five thousand dollars ($425,000.00). The appellant argues that the bankruptcy court should have given credence to the owner's estimate of the value of the debtor's assets of four hundred and fifty thousand dollars ($450,000.00) and the personal endorsements by the owners securing two hundred and twenty-five thousand dollars ($225,000.00) worth of the debtor's liabilities. This court, however, finds no error in the bankruptcy court's failure to accept the owner's estimate as the correct value of the debtor's assets. Here the esti-

mate of four hundred and fifty thousand dollars ($450,000.00) stemmed from the unsuccessful attempt of the owners to sell their concern; this is surely not the proper basis for gaging the actual value of the debtor's assets. Indeed there was some evidence presented to indicate that the assets of the debtor were worth considerably less than two hundred thousand dollars ($200,000.00).[19] As for the owner's personal endorsements guaranteeing two hundred and twenty-five thousand dollars ($225,000.00) of the debtor's liabilities it is obvious that these endorsements merely provide security for the debtor's creditors; they do not erase the debts owned by the debtor.

Thus, in terms of dollars and cents the appellant fell over one hundred thousand dollars ($100,000.00) short of rebutting the presumption of § 547(f).[20] The appellant would not have had to prove by a preponderance of the evidence that the debtor's assets exceeded his liabilities at the time of the transfer to rebut the presumption; he would have had only to present *some* evidence to that effect to overcome § 547(f). Here all the evidence presented merely supported the presumption of insolvency.

█ Hence the court makes these findings: The two payments were transfers for the benefit of a creditor of the debtor in

validity on the Court's subsequent decision in *Dick v. New York Life Ins. Co.*, 359 U.S. 437, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959), where the Supreme Court did indeed apply the North Dakota presumption against suicide, D. McCormick, *McCormick On Evidence*, 819 (2 ed. 1972). It must be pointed out, however, that the Court's opinion in *Dick* did not even mention the constitutionality of the presumption in question.

17. Subsection (f) creates a presumption of insolvency for the 90 days preceding the bankruptcy case. This presumption is, as defined in Rule 301 of the Federal Rules of Evidence, made applicable in bankruptcy cases by sections 224 and 225 of the bill. The presumption requires the party against whom the presumption exists to come forward with *some* evidence to rebut the presumption, but the burden of proof remains on the party in whose favor the presumption exists. (Emphasis supplied). H.Rept. No. 95–595 to accompany H.R. 8200, 95th Cong., 1st Sess. p. 375 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

18. The appellant admits in his brief that he "did not place affirmative evidence in the record" to rebut the presumption supplied by Code § 547(f).

19. The debtor's assets, with the exception of eight acres and three buildings which were all in fair to poor condition, were valued at $125,000.00. Also the debtor's assets were sold at auction (admittedly a forced sale) for $100,000.00 per year so it is doubtful that it would have been worth more than $100,000.00 if sold as a going concern as the plaintiff argues.

20. Even had the trustee furnished the Small Business Administration's appraisal of the debtor's assets which placed the debtor's value $321,000.00, there would still have been insufficient evidence to rebut the presumption of § 547(f) as the debtor's liabilities were placed at $425,000.00. Thus the bankruptcy court properly refused to relieve the appellant of the judgment of that court.

payment of an antecedent debt.[21] The transfers were made while the debtor was insolvent and within ninety (90) days of the debtor's filing a petition for relief. And, finally, the transfers had the effect of giving the creditor a greater recovery than he would have received had the transfers not been made and a bankruptcy liquidation occurred.[22] Hence the requisites of Code § 547(b) were met and the bankruptcy court correctly found these payments to be voidable preferences.

The appellant next argues that even if the two payments meet all of the elements of voidable preferences, they may not be avoided by the trustee because they fall within the exceptions to Code § 547(b) found in Code §§ 547(c)(1)[23] and (2)[24]. The appellant maintains he falls within the first exception because the two payments for the corn constituted contemporaneous exchanges for new value. This exception is limited to situations where the parties intend the transfer to be a contemporaneous exchange for value and the exchange is, in fact, substantially contemporaneous.[25] As several commentators have noted, the key inquiry is whether the parties at the outset intended the exchange to be contemporaneous.[26]

■ In the instant case, while there was some conflict in the testimony as to the nature of the transaction, there was adequate evidence to support the bankruptcy court's finding that the transaction was a conditional sale on an open account rather than a contemporaneous exchange for new value. The testimony of the debtor's general manager and the debtor's books and records showed that the debtor, at least, considered the transaction to be a credit sale, not a contemporaneous exchange.[27] Also, the fact of the delivery of the corn to the debtor in May of 1980 with payments not being made until August 28 and September 2 of 1980 are antithetical to a contemporaneous exchange and, indeed, are not substantially contemporaneous even if they had been intended as such. Hence Code § 547(c)(1) affords the appellant no protection.

The appellant also claims that the circumstances surrounding the transfers places him within the exception of Code § 547(c)(2). That section exempts a transfer from the avoiding powers of the trustee as long as the debt was incurred in the ordinary course of business of the debtor and transferee, and the payment of the debt was in the ordinary course of business according to ordinary business terms.

This particular question presents the court with the thorniest issue of this appeal. The problem here is definitional; to wit,

---

**21.** The appellant has argued that he was not a creditor of the debtor because he maintained title to the corn until the debtor bought it. This argument must be rejected in view of the fact that even if the appellant's view of the transaction is accepted, it cannot be gainsaid that a bailor is a creditor of his bailee.

**22.** There was some mention in the appellant's brief of the fact that the appellant did not receive payment for, or the return of, all of his corn and that he "has already lost a considerable sum of money by reason of the [debtor's] insolvency." There was, however, no argument made on appeal that the two payments represent a sum smaller than the appellant would have received *pro rata* under a bankruptcy liquidation. Hence, the court assumes this final requirement of Codes § 547(b) was met.

**23.** Code § 547(c)(1): "The trustee may not avoid under this section a transfer to the extent that such transfer was—(A) intended by debtor and creditor to and for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange; . . . ."

**24.** Code § 547(c)(2): "The trustee may not avoid under this section a transfer to the extent such transfer was—(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made not later than 45 days after such debt was incurred; (C) made in the ordinary course of business or financial affairs of the debtor and transferee; and (D) made according to ordinary business terms; . . . ."

**25.** *See* II W. NORTON, BANKRUPTCY LAW & PRACTICE, § 32.13, 32.41 (1981).

**26.** *See* 4 COLLIER, COLLIER ON BANKRUPTCY, 547.38 at p. 547–119 (15 ed. 1979).

**27.** Transcript of Record, pp. 8–9.

what is meant by the phrase: "date when debt is incurred?" Or more precisely when is a debt incurred under an option contract?[28] Is it incurred when the goods are first delivered to the debtor or when the date for payment is set? Due to the recency of this legislation there is meager case law to light the court's path in this situation, hence the court must look to commentators and the statute itself for guidance.

The bankruptcy court ruled that the debt was incurred when the grain was first delivered in May 1980. The bankruptcy court cited a passage from COLLIER ON BANKRUPTCY as support for this ruling:

> The probably better view is that the debt is incurred when the debtor obtains a property interest in the consideration exchanged giving rise to the debt.[29]

Then the bankruptcy court cited a passage from a law review article by Richard B. Levin, a member of the House Judiciary Committee Staff for further support:

> For the purpose of this exception, the debt is incurred when it becomes a legally binding obligation on the debtor.* Thus, when the goods were shipped, the debtor becomes liable for the payment and the debt is incurred.[30]

As general rules of law these statements are sound, however, this court doubts that they are applicable in this situation. Both statements were directed at transactions where the goods were sold on credit. As noted above the transaction was not a sale on credit, but on option contract. An option contract requires a different analysis under Code § 547(c)(2), since the debt may not be incurred at the same point as a credit transaction.

■ As to when a debt is incurred under an option contract, use can be made of the Levin passage quoted above which states that a " . . . debt is incurred when it becomes a legally binding obligation on the debtor."[31] Substantial case law further supports the proposition that a debt is not incurred until the debtor first becomes legally bound to pay for the goods.[32] It would further seem obvious that while in a credit transaction the debt becomes legally binding as soon as the credit is extended, conversely, with an option contract the debt is not legally binding on the debtor until he exercises his option to buy the goods subject to the option contract. Here the corn could have been returned by the debtor up until July 19 and no debt would have been incurred. Thus it would seem that the debtor was not legally bound to pay for the corn until the option ended on July 19 and it appears that if this date is accepted as the date the debt was incurred then the two payments were made within forty-five days of that date. One of the requisites of Code § 547(c)(2) was met.

■ This leaves the question of whether the debt was incurred and the payments made in the ordinary course of the debtor's and creditor's business according to ordinary business terms. Unfortunately the legislative history of the Code provides no

---

**28.** There was evidence presented to the effect that the transaction was a credit sale, but the bankruptcy court implicitly found that it was an option contract. (See the Bankruptcy Court's decision at p. 4). Had the bankruptcy court found the agreement to be a credit transaction the situation would have been easily resolved in favor of the trustee since a debt is incurred in a sale on credit when the goods are first received. This court, however, must accept the bankruptcy court's findings as to fact unless they are clearly erroneous.

**29.** 4 COLLIER, COLLIER ON BANKRUPTCY, § 547.35 at p. 547–121 (15 ed. 1979). But Collier goes on to say that this applies only in the absence of a special agreement. It is submitted that an option contract is such a special agreement.

**30.** "An Introduction to the Trustee's Avoiding Powers", 53 Am.Bankr.L.J. 173 (Spring 1979).

**31.** Id.

**32.** See, e.g., In re Dennis, CCH Bankr.L.Rptr., ¶ 68297 (7th Cir.1981) (Code § 547(c)(2) extends only to situations where payment is made within 45 days after debtor first becomes legally bound to pay.); In re Donny, 11 B.R. 451 (Bkrtcy.W.D.Wis.1981) ("Installment debt is incurred on date on which the debtor originally assumes legal obligation to pay."); In re Bowen, CCH Bankr.L.Rptr. ¶ 67434 (Bkrtcy.E.D. Tenn.1980) (" . . . debt is incurred, within the meaning of 11 U.S.C.S. § 547, on date it becomes a legally binding obligation on the debtor . . . .")

guidance as to the content of these phrases and, again, since the concept is new to bankruptcy law there is no developed base of case law upon which to draw. Of some help is the stated purpose of this code section:

> The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.[33]

Clearly, "unusual action" would be any action by either party that deviates from normal business practice. What are the perimeters of normal business practice? Presumably it means that only unusual or abnormal actions by the parties to collect or pay on an existing debt are proscribed.[34] Actually the requirement that the creditor show that the transaction was conducted in the ordinary course of business should usually be easy to meet. Since this showing is required merely to assure that neither the debtor nor the creditor do anything abnormal to gain an advantage over other creditors, an extensive showing that such transactions occurred often, or even regularly, is not necessary. The transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally.

Here the bankruptcy court was correct in holding that the appellant failed to show that the debt was incurred or that the payments were made in the ordinary course of the debtor's and appellant's business. The appellant need only to have shown that he, or other farmers, had entered into like option contracts with the debtor in the past. Such a showing was not made and the appellant cannot find safety in Code § 547(c)(2) from the avoiding powers of the trustee.

This court finds that the trustee may avoid these transfers under the provisions of Code § 547(b) as preferential transfers. Since this ruling completely disposes of the matter, it is unnecessary that the issue of whether the payments could also be recovered under Code § 544(a) be determined at this time.

AND IT IS SO ORDERED.

---

**33.** H.Rept. No. 95–595 to accompany H.R. 8200, 95th Cong., 1st Sess., p. 373 (1977), U.S. Code Cong. & Admin.News 1978, p. 1329.

**34.** See 2 NORTON, BANKRUPTCY LAW & PRACTICE, § 32.19 at 32–55.