**In re MAGIC CIRCLE ENERGY CORPORATION, Debtor.**

**In re Wm. J. O'CONNOR and Jane O'Connor, Debtors.**

**Bankruptcy Nos. BK–85–01336–B, BK–84–02884–B and BK–84–02883–B.**

United States Bankruptcy Court, W.D. Oklahoma.

Aug. 19, 1986.

Andrews Davis Legg Bixler Milsten and Murrah by Jack L. Kinzie, Bobbie T. Shell and Laura J. Stakley, Oklahoma City, Okl., for Magic Circle Energy Corp.

Pate and Payne by William C. McAllister, Oklahoma City, Okl., for B.J. Hughes Services.

## MEMORANDUM OPINION
## AND ORDER

ROBERT L. BERRY, Bankruptcy Judge.

This matter comes on for consideration of an objection by the debtor, Magic Circle Energy Corporation ("Magic Circle") to a proof of claim filed by B.J. Hughes Services, a division of Hughes Tool Company ("Hughes"). After a hearing on the matter, the court requested that the parties file a stipulation of facts and any further legal memoranda in support of their respective positions. Pursuant to Fed.R.Bankr.P. 7052 the court now enters the following findings of fact and conclusions of law.

Concerning the subject claim and objection thereto, the parties filed a stipulation of facts, the pertinent of which are as follows.

On July 9, 1985, Hughes filed a proof of claim against Magic Circle in the amount of $142,906.01. On March 17, 1986, Magic Circle objected to this claim on the grounds that Hughes was the transferee of avoidable preferential transfers in the amount of $10,865.64. The claim arose as a result, commencing prior to the spring of 1983, of Hughes providing certain services to Magic Circle in connection with Magic Circle's oil and gas operations. That these services were provided by Hughes is evidenced by invoices submitted by Hughes to Magic Circle.

In the spring of 1983, Magic Circle began experiencing financial difficulties and entered into a workout with its creditors, including Hughes. As part of its workout with Hughes, the parties agreed to restructure Magic Circle's outstanding debt to Hughes, and on September 26, 1983, Magic Circle executed a promissory note in the amount of $174,282.97 with interest at a rate of eight percent per annum payable to Hughes in monthly installments over a seven year period.

On April 16, 1985, Magic Circle filed its petition for chapter 11 relief in bankruptcy. In the ninety days prior to April 16, 1985, Magic Circle made four installment payments to Hughes on the September 26, 1983 note totalling $10,865.64. Magic Circle argues that these payments are preferential transfers, avoidable pursuant to 11 U.S.C. § 547.[1]

■ As an initial matter we need address Hughes' contention that the issue of a preferential transfer must be brought by way of an adversary proceeding, Fed.R. Bankr.P. 7001 *et seq.*, and since such is not the case in the matter at bar, the current proceedings are not in a proper procedural posture. Hughes asks that we reconsider our order of May 21, 1986, in which we held that Hughes' objection to proceeding with this matter absent the filing of an adversary proceeding, would be overruled. As we noted in the May 21 order, Fed.R. Bankr.P. 3007, dealing with objections to claims, is clear that should an objection to a claim be joined with a demand for relief of the kind specified in Fed.R.Bankr.P. 7001, it becomes an adversary proceeding. Accordingly, nothing persuades us that our order of May 21 was incorrect; Hughes' request for reconsideration will therefore be denied.

There seems to be no dispute between the parties that the subject payments constitute preferential transfers pursuant to 11 U.S.C. § 547.[2] Assuming, without deciding, that the payments in question are preferential in nature, we address the sole issue before us: whether or not the subject payments are immunized from application of § 547 by way of § 547(c)(2).[3]

Attached to the stipulation filed by the parties in this matter were portions of the transcript of testimony taken of Wm. J. O'Connor, the president of Magic Circle, at a Rule 2004 examination conducted by Hughes in connection with this matter.[4] Hughes urges that these selected portions clearly indicate that the subject transfers were within the ordinary course of business of the parties.[5] Hughes refers us to

---

1. Pursuant to 11 U.S.C. § 1107 a debtor in possession has the same rights and may perform the same functions and duties as a trustee, including the institution of a preference action.

2. Section 547(b) provides:
   Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
   (1) to or for the benefit of a creditor;
   (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
   (3) made while the debtor was insolvent;
   (4) made—
   (A) on or within 90 days before the date of the filing of the petition; or
   (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;
   (5) that enables such creditor to receive more than such creditor would receive if—
   (A) the case were a case under chapter 7 of this title;
   (B) the transfer had not been made; and
   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

3. This subsection provides that:
   The trustee may not avoid under this section a transfer—

to the extent that such transfer was—
(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms.

4. Fed.R.Bankr.P. 2004(a) provides:
   Examination on Motion. On motion of any party in interest, the court may order the examination of any person.

5. Relevant portions of the testimony were as follows:
   Q And how were the trade creditors made aware of such problems?
   A Well, usual course of business.
   Q And what is meant by that term?
   A Slow pay by Magic Circle as the same with all oil people in the trade that I am familiar with and most independents.
   \* \* \* \* \* \*
   Q Do you know if payments were being regularly made on such a note?
   A I was told that payments on all notes were being paid up until bankruptcy started.
   \* \* \* \* \* \*
   Q And, Magic Circle was living up to the agreements that it was making in connection with the trade creditor debt, is that correct?

no case law in support of its position, rather it relies solely on the testimony taken at the aforementioned Rule 2004 examination.[6]

Section 547(c)(2) speaks in the conjunctive. All three elements must be present in order to render the transfer in question nonavoidable.[7] The subject transfer must be in payment of a debt which is both incurred by the debtor and made in the ordinary course of business of the debtor and the transferee, and must be made according to ordinary business terms. We will discuss these elements *seriatim.*

Regrettably the term "ordinary course of business" has been left undefined by the Bankruptcy Code. The legislative history merely provides that "[t]he purpose of this exception [§ 547(c)(2) ] is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S.Rep. No. 989, 95th Cong., 2d Sess. 88 (1978), U.S.Code Cong. & Admin.News, 1978, pp. 5787, 5874. "Congress found in Section 547(c)(2) a means to protect *normal financial relations* between the debtor and its creditors." *Merrill v. Abbott (In re Independent Clearing House Co.),* 41 B.R. 985, 1014 (Bankr.Utah 1984) (emphasis supplied). *See also Evans Temple Church of God in Christ and Community Center, Inc. v. Carnegie Body Company (Matter of Evans Temple Church of God in Christ),* 55 B.R. 976, 984 (Bankr.N.D.Ohio 1986) ("The ordinary course of business exception found in Section 547(c)(2) contemplates normal credit transactions such as the sale of goods from a business supplier. . . ."); *Morris v. United States (In re Morris),* 53 B.R. 190, 192 (Bankr.Or.1985)("This court believes that the purpose of § 547(c)(2) was to encourage creditors to continue short-term credit dealings with troubled debtors in order to forestall bankruptcy rather than encourage it.").

◼ The foregoing definitions, albeit helpful, do not however preclude further discourse. Application of § 547(c)(2) requires the court to examine a subject transaction from two distinct perspectives. The term "ordinary course of business" may be viewed as one which attempts to express the relation between the debtor and a creditor as though that relation were in a vacuum. Stated another way, the court need determine that which is "ordinary" as between the debtor and a creditor from a purely subjective viewpoint. *See* 11 U.S.C. § 547(c)(2)(A) and (B). The court is further required to view the subject transaction from an objective viewpoint: whether the subject transfer was made according to common industry practice. 11 U.S.C. § 547(c)(2)(C).[8] "To be subjectively 'ordinary' as between the parties implies some consistency with other business transactions between the debtor and the creditor." *Production Steel, Inc. v. Sumitomo Corporation of America (In re Production Steel, Inc.),* 54 B.R. 417, 423 (Bankr.M.D. Tenn.1985). To be objectively "ordinary" implies that the subject transfer did not deviate from the industry norm.

As we have previously noted, the Bankruptcy Code leaves "ordinary course of

A That is correct.

      *    *    *    *    *    *

Q And that note would also be among those that was being regularly paid in an effort to work out the—
A That's my understanding—
Q Debt to the trade creditors.

6. We note that, pursuant to 11 U.S.C. § 547(g), "the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section."

7. Magic Circle's bankruptcy petition was filed in 1985 hence § 547(c)(2), as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353, July 10, 1984, applies. Tne amended version of § 547(c)(2) omitted the requirement that the subject transfer be made not later than 45 days after the debt was incurred.

8. There can be little doubt that the determination as to whether a subject transfer was made "according to ordinary business terms" requires that it be viewed in the context of the business in which the parties are engaged.

business" and "ordinary business terms" undefined. The definition of these terms will necessarily be determined on a case-by-case basis. Nonetheless, it should not be supposed that these terms are defined without some reference point. Inasmuch as a court is called upon to place itself in a commercial setting when interpretation of § 547(c)(2) arises, it is perforce logical to allude to commercial law and in particular the Uniform Commercial Code, adopted in Oklahoma at Okla.Stat. tit. 12A, § 1–101 *et seq.* (1981). While the Commercial Code does not define "ordinary course of business" and "ordinary business terms", it does define "course of dealing" and "usage of trade".[9] Resort to a definition of these latter terms would provide further illumination if necessary.

### Debt Incurred in the Ordinary Course of Business

█ Magic Circle posits that while it initially incurred the debt for the services Hughes rendered to it in the course of Magic Circle's oil and gas operations, the restructuring of the debt by way of the workout created a "new" debt with the execution of a long-term promissory note; that "[t]here is a marked difference between a long-term loan and the ordinary credit transactions protected by § 547(c)(2)." Debtor's Supplemental Brief at 7. It is argued that this long-term installment note cannot be considered as being incurred in the ordinary course of business of either Magic Circle or Hughes.

We do not accept the proposition that the consolidation of Magic Circle's debt owed to Hughes into a long-term promissory note wrought a metamorphosis wherein the nature of the debt was altered. There is no suggestion that an accord and satisfaction occurred, *see Walker v. Ellinghausen,* 309 P.2d 1058 (Okla.1957), and we do not find one to be present today.

While we can concur in the proposition that there exists a distinction between a long-term loan and an ordinary credit transaction, we do not believe that such dissimilitude is pertinent to the matter at bar. There is no dispute that the underlying debt was incurred in the ordinary course of business affairs of Magic Circle and Hughes. The mere restructuring of the payment terms does not alter the fact that the underlying debt was incurred under normal circumstances. Cf. *Matter of Evans Temple Church of God in Christ, supra,* 55 B.R. at 984 ("The relationship between [the creditor and debtor] in this case did not arise in the course of such an ordinary trade credit transaction. Rather, the relationship arose in the context of a one-time repair job performed by [the creditor]".). We find that the debt was "incurred in the ordinary course of business" of Magic Circle and Hughes.

### Made in the Ordinary Course of Business

Magic Circle further urges that the subject transfers were not ordinary as between Magic Circle and Hughes; that the subject transfers were made pursuant to a long-term promissory note executed by Magic Circle as part of its workout with Hughes, and not in the ordinary course of business. "Had Magic Circle been able to pay its creditor in the ordinary course of business it would not have had to refinance the debt at all." Debtor's Supplemental Brief at 8.

█ As we have previously noted, the cornerstone of this element of a preference defense is that the creditor needs demonstrate some consistency with other business transactions between the debtor and the creditor. Conversely, those cases which have held that the creditor failed to establish this element, have done so on the basis that the payment was extraordinary in nature or amount, or was paid by some unusual method. *Compare Morrow v.*

---

**9.** "Course of dealing" is defined as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Okla.Stat. tit. 12A, § 1– 105(1)(1981). "Usage of trade" is defined as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." *Id.* at (2).

*United States (In re Morris)*, 53 B.R. 190 (Bankr.D.Or.1985) (debtor was acting in ordinary course of business when it timely paid taxes to the IRS even though debtor in the past had not generally paid taxes in timely manner) *with Ledford v. Sears, Roebuck & Company (Matter of Williams)*, 5 B.R. 706 (Bankr.S.D.Ohio 1980). The court in *Williams* held that where a debtor ordinarily paid $28 per month on a revolving charge account, payments totalling $344.83 made three weeks prior to filing bankruptcy were not "in the ordinary course of repayment established between these parties during the long existence of the account." *Id.* at 707.

The case of *Production Steel, Inc. v. Sumitomo Corporation of America (In re Production Steel, Inc.)*, 54 B.R. 417 (Bankr.M.D.Tenn.1985) is illustrative of the factors which a court considers when determining whether a transaction was "made in the ordinary course of business". The facts in *Production Steel* were as follows. Prior to the filing of bankruptcy the debtor on three separate occasions had purchased steel from the creditor. With respect to the transaction which was sought to be determined as preferential, the creditor radically altered its course of dealing with the debtor, aware of the debtor's deteriorating financial condition. Specifically, for the first time the creditor required that the debtor secure the purchase price with a letter of credit. A substantial down payment, previously unrequired, was demanded and received before the creditor would place the steel for fabrication. The terms in each of the three prior transactions called for payment thirty days after delivery and the debtor was invoiced accordingly. However with respect to the transfer before the court, the creditor had demanded that the balance of the contract price be made before due under the contract, with demand accompanied by a threat to call upon the letter of credit. Lastly, a postdated check was issued and accepted. As the court noted, "[t]hese variations from the usual course of dealings are significant and revealing. All of the changes resulted in further security and safety for [the creditor]." *Id.* at 423. The court went on to state that the variations "were required or encouraged by [the creditor] and none can be said to have benefited [the debtor]." *Id.*[10] "All the demanded changes are consistent with the view that [the creditor] knew of the debtor's financial problems and wanted more favorable terms than in the past." *Id.*

There can be no doubt that Hughes was aware of Magic Circle's financial problems. The debt restructuring pursuant to the workout amply evidences such. Yet it cannot be said that the workout was executed without a *quid pro quo* as between Magic Circle and Hughes: Magic Circle benefitted from Hughes' services and Hughes was paid for services performed. In short, the transactions were not "unusual, extraordinary, and unrelated to any business enterprise whose protection was intended by the drafters of section 547(c)(2)." *Merrill v. Abbott (In re Independent Clearing House Company)*, 41 B.R. 985, 1015 (Bankr.D.Utah 1984) (payments to investors in a "Ponzi" scheme could not constitute transfers in the ordinary course of business and made according to ordinary business terms).

The court in *Campbell v. Cannington (In re Economy Milling Company, Inc.)*, 37 B.R. 914 (D.S.C.1983) stated the issue thusly:

> [T]he requirement that the creditor show that the transaction was conducted in the ordinary course of business should usually be easy to meet. Since this showing is required merely to assure that neither the debtor nor the creditor do anything abnormal to gain an advantage over other creditors, an extensive showing that such transactions occurred often, or even regularly, is not necessary. The transaction need not have been common; it need

---

**10.** We note that this concept of "benefit to the debtor" for purposes of determining whether a subject transaction was "in the ordinary course of business" is one not listed as a Bankruptcy Code requirement. While possibly meritorious, we express no opinion thereon.

only be ordinary. A transaction can be ordinary and still occur only occasionally. *Id.* at 922. The transfers at issue had been occurring since sometime in late September or early October of 1983 and continued until the filing of bankruptcy by Magic Circle in 1985. We cannot say that these transfers were so unusual or extraordinary so as to render them not "made in the ordinary course of business" between Magic Circle and Hughes.

## Made According to Ordinary Business Terms

Magic Circle argues that this final element cannot be established by Hughes for the reason that the terms provided for in the long-term installment note which Magic Circle had executed pursuant to the workout were completely different from the usual business practices conducted between Magic Circle and Hughes prior to the workout.

Whether the terms of the workout were different from the terms under which Magic Circle and Hughes had previously transacted business is not the issue. The issue is whether the workout and the long-term installment note, "when taken together, constitute a transaction made according to ordinary business terms." *Production Steel, supra,* 54 B.R. at 424. The issue is whether the transactions were made pursuant to the ordinary business terms of the oil and gas industry.

The evidence as to this last point is somewhat sparse. While there was no direct evidence offered as to what "ordinary business terms" were in the oil and gas industry in 1983, this court is sufficiently familiar with such industry to take

judicial notice that a workout which contemplated a promissory note at eight percent per annum payable in monthly installments over a period of seven years was well within "ordinary business terms".

## Conclusion

It has recently been stated that "[t]he 'ordinary course of business' standard is purposely not defined so narrowly as to deprive a debtor of the flexibility it needs to run its business and respond quickly to changes in the business climate." *Committee of Asbestos—Related Litigants and/or Creditors v. Johns-Mansville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 617 (Bankr.S.D.N.Y.1986).[11] This sentiment merely recognizes the commercial realties of the business world. To follow the argument of Magic Circle would detrimentally impinge on this requisite flexibility, with the even more harmful result of potentially discouraging debt restructuring.

The purpose of a preference action is to prevent a particular creditor from obtaining more favorable treatment than other creditors. To permit the transactions at bar to remain undisturbed does not alter this purpose.

Lastly, with respect to the burden of proof in this matter, we previously pointed out that Hughes bore the burden of proof.[12] Concerning the portions of the transcript taken from the testimony of the president of Magic Circle at the Rule 2004 examination,[13] a layman's usage of "ordinary course of business" obviously does not elevate the term to such heights as that necessary for purposes of a legal sufficien-

---

**11.** This opinion dealt with the question of whether the debtor could employ lobbyists to represent it in connection with pending legislation, without obtaining prior court approval. The court held that such action was within the ordinary course of business of the debtor pursuant to 11 U.S.C. § 363 (use, sale or lease of estate property), hence prior court approval was unnecessary. While the *Manville* court dealt with "ordinary course of business" in the context of § 363, it noted that the term, irrespective of Bankruptcy Code section, "is uniformly construed as a transaction that occurs in the day to

day operations of a business." *Manville, supra,* 60 B.R. at 618 (citing with approval *Economy Milling, supra,* 37 B.R. at 914). *See also In re Cascade Oil Company, Inc.,* 51 B.R. 877 (Bankr. D.Kan.1985) (employing similar definition when faced with § 364 obtainment of credit "in the ordinary course of business.").

**12.** *Infra* at n. 6.

**13.** *Infra* at n. 5.

cy. Nonetheless, when viewing the surrounding circumstances, *in toto*, Hughes has borne its burden of proof.

Accordingly, for the foregoing reasons, the objection of Magic Circle Energy Corporation to the proof of claim filed by B.J. Hughes Services shall be and hereby is, overruled.