**In re SOUTHERN INDUSTRIAL BANKING CORPORATION, Debtor.**

**Thomas E. DUVOISIN, Liquidating Trustee, Plaintiff,**

v.

**Anne B. WILDE, Trustee for Ashley A. Wilde and Byron B. Wilde, Jointly, Defendants.**

**Bankruptcy No. 3–83–00372. Adv. No. 3–84–0185.**

United States Bankruptcy Court, E.D. Tennessee.

Sept. 13, 1994.

---

Hunton & Williams, John A. Lucas, Knoxville, TN, for plaintiff.

Gullett, Sanford, Martin & Robinson, Nashville, TN, for defendants.

## MEMORANDUM

JOHN C. COOK, Bankruptcy Judge.

This adversary proceeding is before the court on the complaint of Thomas E. DuVoisin, Liquidating Trustee, alleging that defendants, Anne B. Wilde and her two children, Ashley A. Wilde and Byron B. Wilde, received preferential transfers from the debtor, Southern Industrial Banking Corporation ("SIBC"), which are avoidable as preferences under 11 U.S.C. § 547(b). Having considered the evidence and the arguments of the parties, the court now makes its findings of fact and conclusions of law pursuant to Fed. R.Bankr.P. 7052.

### I.

As trustee for her two children, defendant Anne Wilde received the distributions of several trusts established by her father, Ed Browder, for the benefit of his grandchildren, defendants Ashley and Byron Wilde. Mr. Browder was a well-to-do businessman who owned and operated several businesses in the vicinity of Knoxville, Tennessee. His financial success allowed him to own stock in United American Bank, controlled by Jacob F. Butcher, and City & County Bank, controlled by C.H. Butcher Jr., as well as to sit on the boards of directors of both of those banks. At all times material hereto, Mr. Browder also sat on SIBC's board of directors. Knowing that Mrs. Wilde had substantial trust distributions to invest on behalf of her children, her father suggested that she buy investment certificates from SIBC, which was then paying interest at rates higher than any comparable institution paid. Mr. Browder asked Brenda Burleson (formerly Pilson), the senior investment counselor who handled his investments at SIBC's West Town branch, to assist Mrs. Wilde with her investments when she came in.

Between June 16, 1982, and November 15, 1982, Mrs. Wilde purchased five investment certificates that ranged in amount from $20,-

000 to $230,000, each of which was scheduled to mature on January 5, 1983. Because each investment certificate was purchased on a different date, each certificate was given a maturity date in days, rather than months or years, so as to synchronize them for concordant maturity on January 5, 1983. Thus, for example, one certificate matured in 203 days, another in 196 days, and still another in 51 days. Although the five certificates were purchased on diverse dates over a five-month period during which SIBC's published rates varied widely, each of the investment certificates issued to Mrs. Wilde bore the interest rate of 16% per annum. With a few exceptions, this rate was substantially higher than the rate paid to other customers who bought investment certificates at the same times and in similar amounts. One of these few exceptions was Mrs. Wilde's father, Ed Browder, who received the rate of 17% per annum on a comparatively small investment of short duration bought on June 15, 1982.

On January 5 or 6, 1983, after all five of her investment certificates had matured together on January 5, 1983, Mrs. Wilde went to the office of SIBC and met with Brenda Burleson for the purpose of redeeming her investment certificates and perhaps reinvesting the proceeds. Mrs. Wilde and her husband had decided to invest the childrens' trust funds in one of her husband's real estate ventures, Hearthstone Apartments, but due to the vagaries of the construction schedule Mrs. Wilde did not know exactly when the funds might be needed. Accordingly, she sought assurances from Brenda Burleson that, if she reinvested the funds, she would be allowed to withdraw them prematurely without any interest penalty. In her testimony she stated:

> I told her that we had this project at Hearthstone that we were about to begin and I wasn't sure when I would be needing the money; and she reassured me that there would be no problem. Whenever I needed the money I would be able to get it out without any penalty.

Thus reassured, Mrs. Wilde reinvested the proceeds of the five investment certificates by buying two new ones, the first in the sum of $100,000 payable at maturity in one month at the rate of 14% per annum, the second in the sum of $278,000 payable in ninety-nine days at the rate of 14% per annum.

Each of the investment certificates Mrs. Wilde bought on January 5 or 6, 1983, and all the certificates she had previously bought at SIBC, bore the following standard penalty provision:

> Withdrawal of the deposit represented by this Investment Certificate by the holder prior to maturity is subject to approval by the Corporation. In the event of such approved withdrawal, the Corporation will pay interest hereon at its prevailing Investment Account rate, less a penalty of ninety (90) days interest computed on such Investment Account rate.

Mrs. Wilde was familiar with this penalty provision and negotiated the terms of her reinvestment so as to avoid it specifically. As she stated in her trial testimony,

> I knew that there were penalties involved, but I did discuss that with her [Brenda Burleson], and she said that if I needed to reinvest the money for a short period of time that there would be no penalty *if I reinvested it.*

(Emphasis added.) Thus, she reached an agreement with SIBC on January 5 or 6, 1983, that allowed her to invest a total of $378,000 without risking the usual penalty for early withdrawal.

According to the trial testimony of Brenda Burleson, the senior investment counselor who attended Mrs. Wilde, SIBC would waive the interest penalty for those who asked. This was apparently done on a purely discretionary basis.

> Q. Now, SIBC had no policies or guidelines for the waiver of penalties, did they? It was just whatever the executive officer decided to do—nothing in writing, no formal policies.
>
> A. It was just up to the judgment of the corporation's management.
>
> Q. But as far as you knew, there were no corporate policies that guided him in the exercise of that judgment, were there?
>
> A. No, sir.

Although Mrs. Burleson testified that she was never refused the authority to waive an interest penalty, she did not testify about the frequency with which SIBC waived these penalties, and there is no evidence in the record from which the court can determine the prevalence of this practice. Indeed, on cross-examination, Mrs. Burleson admitted its relative abnormality.

Q. In fact, didn't you also testify at your deposition that a waiver of a penalty was very unusual and didn't occur often?

A. Under normal rates and terms that people had, that's correct.

Q. In the normal case?

A. In normal cases.

Q. In the normal case, if a person cashed in an investment certificate prior to maturity, they paid the interest penalty?

A. That's correct.

Q. And, in fact, although there may have been some rare departures for that, you can't recall any others anywhere this large, can you?

A. Not this large.

On January 20, 1983, following a conversation with her husband in which he told her that the funds invested at SIBC would be needed soon for construction financing on the Hearthstone Apartments, Mrs. Wilde went to SIBC and redeemed both investment certificates prematurely. She paid no interest penalty and instead received the full amount of the interest her investments had earned during the 15–day period, approximately $2200. In her testimony she made it clear that the waiver of the penalty was not an *a posteriori* matter on January 20, 1983, but an *a priori* contract term negotiated on January 5 or 6, 1983, when she bought the investment certificates.

Q. And when you went in there on January 20th, did you request that they waive the early withdrawal penalty?

A. I'm not sure whether it was discussed or not, but we had had that agreement to begin with, and there was no penalty.

At all times material hereto, SIBC also offered its customers the convenience of passbook accounts, which SIBC publicly advertised as carrying "no penalty upon early withdrawal." These passbook accounts paid interest at a rate much lower than that offered on any investment certificate, the typical spread being several percentage points. On January 6, 1983, SIBC's passbook accounts paid an interest rate in the vicinity of seven percent.

On March 10, 1983, SIBC filed its petition for relief under Chapter 11 of the Bankruptcy Code. In due course the liquidating trustee for SIBC brought this preference action against the defendants.

## II.

■ It has been previously determined in this proceeding that the transfers made by SIBC to Mrs. Wilde on January 20, 1983, are avoidable unless they were made in the ordinary course of business. Thus, the only issue now before the court is whether or not Mrs. Wilde has a valid defense under 11 U.S.C. § 547(c)(2), which at the time provided:

> (c) The trustee may not avoid under this section a transfer—
>
> . . . .
>
> (2) to the extent that such transfer was—
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made not later than 45 days after such debt was incurred;
>
> (C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (D) made according to ordinary business terms.

Because the provisions of 11 U.S.C. § 547(c)(2) are defensive in nature, the Bankruptcy Code assigns to the preference defendants the burden of proving every element of the defense. 11 U.S.C. § 547(g).

Mrs. Wilde argues that the debt in question, SIBC's obligation to pay principal plus interest upon maturation of the two invest-

ment certificates bought on January 5 or 6, 1983, was incurred in the ordinary course of SIBC's business as well as her own, all in accordance with § 547(c)(2)(A), in that SIBC's waiver of early withdrawal penalties was not uncommon. Far from proving this proposition, however, Mrs. Wilde's testimony establishes that SIBC entered into an extraordinary agreement with her on January 5 or 6, 1983, insofar as that testimony shows that, before buying the two investment certificates at issue, she sought and obtained SIBC's assurances that she could withdraw her funds at any time without penalty. There is some inconsistency between the testimonies of Mrs. Wilde and Mrs. Burleson concerning their negotiations over the early withdrawal penalty, for, although Mrs. Burleson remembered assuring Mrs. Wilde that early withdrawals were permitted, she thought she told Mrs. Wilde only that she would try to obtain a waiver of the penalty if, at some later time, Mrs. Wilde wished to redeem her certificates prematurely. The distinction is between the assurance that the penalty was or would be waived and the hope that it might be. Because of her significant financial interest in this substantial transaction, and because, unlike Mrs. Burleson's, her recollection of the event is not diluted by hundreds or thousands of similar transactions, the court accepts the testimony of Mrs. Wilde as the more accurate rendition of the negotiations concerning the waiver of penalty for any early withdrawal.

■ In order to fall within the ordinary-course-of-business exception, the transfers in question must have been in payment of a debt incurred in the ordinary course of business of the debtor and the creditor. Where the debt in question arose by contract, the contract itself must be ordinary because it creates and defines the debt. For example, in *In re Allegheny International, Inc.,* 136 B.R. 396 (Bankr.W.D.Pa.1991), *aff'd,* 145 B.R. 823 (W.D.Pa.1992), the debtor-lessee had agreed, by contract made in November, 1987, to pay rent to the creditor-lessor retroactive to September 30, 1987. The court held that the payments made pursuant to this agreement were outside the ordinary course of business.

These payments were the very first payments made in accordance with the contract. The parties agreed, in November 1987 that rent payments would be due retroactively to September 30, 1987. This was a unique arrangement and cannot be characterized as being in the ordinary course of business. Payments made pursuant to special and unique agreements are outside the ordinary course of business.

*Id.* at 401.

■ Other courts have held that debts incurred by the settlement of a dispute between parties, whether pursuant to legal action or not, are incurred outside the ordinary course of business of the debtor because settlement agreements are themselves unusual. *See Energy Cooperative, Inc. v. SOCAP International, Ltd. (In re Energy Cooperative, Inc.),* 832 F.2d 997, 1004 (7th Cir. 1987) (debt incurred by debtor upon settlement of breach of contract claim against debtor not incurred in ordinary course of its business); *Carrier Corporation v. MID Corporation (In re Daikin Miami Overseas, Inc.),* 65 B.R. 396, 398 (S.D.Fla.1986) (payments made pursuant to settlement of previous debt not in ordinary course of business); *Gull Air, Inc. v. Beech Acceptance Corp. (In re Gull Air, Inc.),* 82 B.R. 1, 4 (Bankr. D.Mass.1988) (payments on settlement were outside the ordinary course of business where settlement entered into after suit filed to recover on notes evidencing debtor's obligation to pay for goods sold to it). Although there are few cases openly decided under § 547(c)(2)(A) itself, the courts that have considered situations involving special or unique agreements have usually held that *payments* made pursuant to those agreements were outside the ordinary course of the debtor's business, and they have done so without getting down to the bedrock and first holding that the *debts* arising from such agreements were incurred outside the ordinary course of business. However, where, as in the contract and settlement cases mentioned above, there is nothing extraordinary about the form of the payments themselves, and the extraordinary features present in the case are born of the agreements, the cases can be

construed as authority for the principle that a special or unique agreement between the debtor and a creditor may be outside the ordinary course of business. If so, a debt incurred as the result of that agreement will likely be outside the ordinary course of business.

The agreement entered into between Mrs. Wilde and SIBC on January 5 or 6, 1983, is unusual because it commits SIBC in advance to waive the interest penalty it would ordinarily exact. There is some evidence that may be gleaned from the testimony of Mrs. Burleson to the effect that, on an unknown number of occasions and for unknown reasons, SIBC, as a matter of benevolence, waived the interest penalty for some other customers; but this occurred only at the point where a customer wished to effect an early withdrawal and, as a supplicant, petitioned for a waiver of the penalty provision then fully in effect. Mrs. Wilde was in a different category, armed in advance with a contract that completely nullified the penalty.

SIBC's agreement to waive the penalty in exchange for Mrs. Wilde's substantial investment appears to be unique and thus quite out of its ordinary course of business. As might be expected, the effect of the agreement was also unique, for, when analyzed, it is apparent that the agreement transmuted Mrs. Wilde from one kind of investor into a strange hybrid. In the normal sale and redemption of investment certificates, SIBC exchanged the interest it paid for the temporary possession of an investor's fund of money. SIBC defended its term of possession with the early withdrawal penalty. In surrendering that penalty to Mrs. Wilde, SIBC gave up its primary defense of the stipulated investment term and essentially allowed her to become a kind of passbook account holder, although one with a difference: her account paid an enormous rate of interest (14%) compared to the others (about 7%). Thus, not only was the agreement that created the debt apparently unusual, but the practical effect of that agreement was a special depositary relationship extraordinarily favorable to Mrs. Wilde and involving the creation of special kind of account not available to others.

The plaintiff argues, and there is some evidence in the record from which the inference could be drawn, that Mrs. Wilde, as the sister-in-law of Jake Butcher and the daughter of Ed Browder, received special treatment throughout the course of her dealings with SIBC. The plaintiff insists that Mrs. Burleson, who admitted she knew Mrs. Wilde's close connections to SIBC's highest management, was hand-picked by Ed Browder to favor his daughter and that, accordingly, Mrs. Wilde received extraordinarily high interest rates on the five investment certificates she bought between June 16, 1982, and November 15, 1982, as well as the two investment certificates she bought on January 5 or 6, 1983. Whether Mrs. Wilde's connections to insiders afforded her exceptional treatment is a question the court need not decide. In the final analysis, the burden of proving that the debt in question was incurred in the ordinary course of business is on the defendants, and they have offered no evidence that SIBC ever made a similar agreement having a similar effect. *See Campbell v. Cannington (In re Economy Milling Co.)*, 37 B.R. 914, 922 (D.S.C.1983) (sustaining preference action because farmer failed to show debtor milling company ever bought corn from him or any other farmer on a similar option contract).

### III.

From the foregoing evidence, the court concludes that the defendants, who bear the burden of establishing the defense permitted by § 547(c)(2), have failed to prove the first element of that defense, that is, that the debt for which the transfers were made was incurred in the ordinary course of the business or financial affairs of the debtor and the creditor. There is no evidence whatever that SIBC ordinarily entered into this kind of agreement with its customers. Because the record in this proceeding establishes that the payments in question were otherwise preferential, the court will enter judgment in favor of the plaintiff.

Within fifteen days of the entry of this order, the plaintiff shall submit a proposed judgment approved as to form by counsel for all parties hereto. If the parties are unable

to agree to the form of the judgment, each party shall submit a proposed judgment for the consideration of the court.